William **WEEDON**, Jr., Defendant Below, Appellant,

v.

**STATE** of Delaware, Plaintiff Below, Appellee.

No. 246, 1999.

Supreme Court of Delaware.

Submitted: March 14, 2000.
Decided: April 14, 2000.

Charles M. Oberly, III, Oberly & Jennings, P.A., Wilmington, Delaware, for Appellant.

William E. Molchen, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH, and BERGER, Justices.

WALSH, Justice:

This is an appeal from the Superior Court's denial of a motion seeking postconviction relief. Although the Superior Court expanded the record to include affidavits of various persons and a videotaped interview, the appellant contends that the court erred in its failure to afford him an evidentiary hearing on two of his postconviction claims. We find that an evidentiary hearing in this case is not procedurally barred and would further the interest of justice. Accordingly, we reverse the Superior Court and remand the case for an evidentiary hearing on appellant's claims.

**I**

The appellant, William Weedon, Jr. (the "defendant"), and John M. Smith ("Smith") were arrested in November 1992 in connection with the severe beating of Ronald E. Ward, Sr. ("Ward") during the early morning hours of October 10, 1992, at his home in Lewes, Delaware. Ward could not identify his attackers.[1] The investigation, however, focused on the defendant after his wife, Jeanine Weedon ("Mrs. Weedon"), contacted the Lewes police on November 4, 1992, and claimed that soon after Ward's attack the defendant had confessed to her that he was responsible.

Mrs. Weedon gave the following account. On October 9, 1992, one day before the attack on Ward, it was discovered that Ward had sexually molested the Weedon's ten-year-old son Billy in 1991.[2] Upon learning this, the defendant shouted, "I'll go down there and kill [Ward]! I'll kill him!" Mrs. Weedon, equally angered, responded "You should." The defendant warned Mrs. Weedon that if she told anybody of his intentions he "would take care of [her]." The next day, between 10:00 and 10:30 a.m., the defendant returned to the Weedon home and told Mrs. Weedon that he and a friend had gone to Ward's house and beaten him with two baseball bats. The defendant also told his wife that they had left Ward and his house in a bloody state and were unsure whether Ward was still alive. The defendant stated that "he hoped he could trust [Mrs. Weedon] being his wife not to tell anyone."

Soon after the investigation focused on the defendant, evidence surfaced that placed him in the area of the crime during the early morning hours of October 10, 1992. On that date, at approximately 2:17 a.m., Lewes Police Officer Gilbert Clampitt ("Clampitt") stopped a blue Chevrolet Nova for a speeding violation. The driver and the passenger identified themselves as Smith and the defendant, respectively. Clampitt noticed two baseball bats inside the vehicle, one of which was cracked, and made inquiry. The defendant informed Clampitt that the two bats were inadvertently left in the compartment of the vehicle after their earlier use at his son's baseball practice. Clampitt ticketed Smith for speeding but allowed the two to proceed.

In early 1993, the defendant and Smith were indicted and jointly tried before a jury on the following charges: Attempted Murder First Degree; Burglary First Degree; Possession of a Deadly Weapon during the Commission of a Felony; Criminal Mischief; and Conspiracy First Degree. Before Mrs. Weedon's account of her alleged conversation with the defendant was presented to the jury, the defendant's attorney objected to it, claiming that the communication was protected by the marital privilege. The court conducted a hear-

---

1. Although Ward gave the police a list of persons who might want to harm him, the police found no evidence linking any of those individuals to the crime.

2. Ward's wife at the time and Mrs. Weedon are cousins. Ward's conduct towards Billy was discovered after Billy attempted to sexually molest his five-year-old sister.

ing to determine if the marital privilege applied to Mrs. Weedon's testimony. The State argued that the privilege was waived due to the defendant's alleged publication of the communication to third parties. In support of this assertion, the State presented testimony by Mrs. Weedon that the defendant had told "[t]he whole neighborhood" what he had done to Ward. The State also presented testimony by Michael Falahee ("Falahee"), a former neighbor of the Weedons, who testified that the defendant admitted to him that he "took care of [Ward]" for molesting his son. The court accepted these accounts as truthful. Because the court found that the defendant disclosed the statements at issue to third parties, it held that his statement to Mrs. Weedon was not protected by the marital privilege. Mrs. Weedon was, thus, permitted to testify as to the defendant's alleged admissions.

At trial, Smith presented an alibi defense. He testified that he had borrowed the defendant's Nova and that he and a friend, Bobby Sherrill, went fishing in Lewes late in the evening of October 9, 1992, and were there until the early morning hours of October 10. On the way out of town, Smith acknowledged that Clampitt stopped him. Smith testified, however, that it was Sherrill who was in the car and not Weedon. Sherrill died the week after the attack on Ward and, therefore, was unable to testify. In rebuttal, the State produced two witnesses who testified that Sherrill was not with Smith during the pertinent time period on October 9–10, 1992.

Although the defendant did not testify at trial, he also presented an alibi defense through witness testimony that provided the following time frame for his whereabouts and activities on October 9 and 10, 1992. The defendant went to his mother's birthday party from early evening to about 9:30/9:45 p.m. He then went to a bar with

friends from approximately 9:45 p.m. to around 1:30/1:45 a.m. on October 10, 1992. Thereafter, he went to a friend's house to play cards with a group of people and stayed there until mid-morning.

The defendant also attempted to discredit the testimony of his wife and Falahee. The defendant's counsel elicited testimony showing that the Weedon's thirteen-year marriage was volatile and acrimonious, that Mrs. Weedon was trying to leave the defendant at the time she contacted police in November 1992, and that Mrs. Weedon and Falahee were engaged in an adulterous relationship at the time of trial.

The jury apparently was not persuaded by the testimony of the defendant or Smith and found both men guilty of Attempted Murder First Degree, Possession of a Deadly Weapon during the Commission of a Felony, and Conspiracy First Degree. The defendant and Smith were sentenced, respectively, to twenty-two and seventeen year sentences. On appeal, this Court reversed Smith's conviction, holding that the Superior Court erred in admitting against him portions of the defendant's alleged admissions. *See Smith v. State,* Del.Supr., 647 A.2d 1083 (1994).[3] The defendant's conviction, however, was affirmed. *See Weedon v. State,* Del.Supr., 647 A.2d 1078 (1994). In so ruling, this Court held, *inter alia,* that the defendant waived the marital privilege by making subsequent disclosures to third persons. *See id.* at 1082.

## II

The defendant filed a motion for post-conviction relief in the Superior Court on September 18, 1997, asserting the following grounds for relief: (i) Falahee has recanted his trial testimony; (ii) Mrs. Weedon's testimony that the defendant admitted to attacking Ward was inadmissi-

---

**3.** On remand, Smith entered into a plea agreement with the State. He pled guilty to Assault First Degree and Possession of a Deadly Weapon during the Commission of a Felony.

ble; (iii) Clampitt's photographic identification of the defendant was unduly suggestive; and (iv) counsel was ineffective.

In connection with this motion, the defendant also filed two requests to expand the record. In the first request, he sought to include affidavits of Falahee, Patricia Woodland, JoEllen Trader and Mrs. Weedon. Falahee's affidavit states as follows:

I, Michael Falahee, would llike [sic] to recant my testimony in the criminal trial of William E. Weedon, Jr. and John M. Smith. At the time of the trial I had been having an intimate affair with Mr. Weedon's spouse, Jeanine M. Weedon while they lived in the same home. This affair had been going on a long time.

I testified that Mr. Weedon confided in me about the sexual abuse his children had gone through and that he had taken care of the molester. But, the truth is that Mr. Weedon's wife, Jeanine Weedon, had told me all about the situation. Mrs. Weedon insisted that I testify that Mr. Weedon told me what she told me he alleged to have done. Mrs. Weedon said that the prosecutor, at the time of the trial, insisted that she find someone to collaborate her story or Mr. Weedon's case would be thrown out of court. Mrs. Weedon also told me the prosecutor told her that her testimony would not be allowed unless there were another person saying the same story as her because she is Mr. Weedon's wife. Mrs. Weedon begged me to say that Mr. Weedon told me the story, but in fact, he did not speak to me about any of it, only Mrs. Weedon spoke of it. Having an intimate relationship with Mrs. Weedon caused me to use very poor judgement [sic] in my decision to testify that Mr. Weedon, and not Mrs. Weedon, told me about the molesting of their son and him allegedly taking care of the person who abused his son.

After reevaluating my statement and after so many years to think about the whole situation I now realize the injustice I have caused Mr. Weedon and Mr.

Smith with my untrue testimony. In closing I must say that I cannot continue living with the burden of this that I have committed. So, I must admit in all honesty that Mrs. Weedon told me what to testify to in court.

Ms. Woodland's affidavit states in pertinent part:

4. At the time of the trial of William Weedon, I was a friend of Jeanine Weedon. I was also aware that she was having an affair with Michael Falahee.

5. It is my recollection that prior to the start of the trial, although I do not recall the exact date, I was present at Jeanine's house when Jim Adkins telephoned. At that time, both Jeanine and Mr. Adkins requested that I testify against William at the trial. Mr. Adkins stated that "you can help put Billy away," and "you can help Jeanine get away from Billy." In response, I recall stating "you can leave me the hell out of it."

6. Jeanine Weedon would always make comments like, "I wish Billy would go away," and "I wish he was dead."

7. Jeanine and Mr. Adkins requested that I testify that William Weedon confided in me that he was responsible for the injuries sustained by Ronald Ward. In short, I was asked to testify that I had personal knowledge. However, I did not. My sole knowledge of the matter was through information provided by Jeanine. Had I testified, it would have been regarding information told to me by Jeanine.

8. I further recall that it was Jeanine, not Billy, who was always telling people about the incident.

Ms. Trader's affidavit states in pertinent part:

5. At the time of the incident involving Ronald Ward, William Weedon *did not* confide in me that he was responsible for the injuries to Ronald

Ward. In fact, I did not have any conversation with William Weedon regarding the incident at all nor do I recall William walking the neighborhood discussing the matter.

6. Any and all information provided to me was provided by Jeanine Weedon.

7. I do believe that at the time of the incident, Jeanine was very unhappy in her marriage. She stated on several occasions that "she wanted to get Billy out of her life."

Mrs. Weedon's affidavit states in pertinent part:

Prior to the start of the trial, Prosecutor James Adkins strenuously urged me to present a witness to corroborate my testimony that William Weedon admitted responsibility for the crimes for which he is charged. During the trial, I testified that in a conversation between William and myself, he admitted that he was responsible for the injuries to Mr. Ward. Mr. Adkins explained to me that because of the marital privilege, the State could not obtain a conviction on just my testimony alone. Specifically, I would need to find someone else whom William Weedon had admitted responsibility for the crime. I requested that Michael Falahee, a resident of the State of Maryland, come to Delaware. Upon arrival in Delaware, I presented Mr. Falahee with a subpoena, commanding his appearance in court. That subpoena was given to me by Mr. Adkins.

The first motion also requested that the court expand the record to include a videotaped interview of Falahee in which he recants his trial testimony.

In the second request, the defendant sought to include the affidavit of Mrs. Weedon's sister, Sharon Carr. That affidavit states in pertinent part:

2. At the trial in the above-referenced matter, Jeanine Weedon confided in me that she was having an affair with Michael Falahee.

3. In addition, I recall a meeting in the office of Jim Adkins where he stated that he wanted to get Mr. Weedon. Jeanine Weedon was also present at this meeting.

4. Jeanine Weedon further explained that she needed to find someone to corroborate her story and that she thought she could get Michael Falahee to do it. I understood that to mean that she could get Michael Falahee to lie for her.

Although the Superior Court expanded the record to include these affidavits and Falahee's videotaped interview, it concluded that an evidentiary hearing was not warranted and denied the defendant's underlying motion for postconviction relief. *See State v. Weedon,* Del.Super., 1999 WL 458727, Lee, J. (May 18, 1999). This appeal followed.

On March 13, 2000, one day before oral argument in this matter, this Court received a letter from the defendant's counsel stating that he had recently received a notarized letter from Mrs. Weedon stating as follows:

I Jeanine Weedon am writing this letter in reference to William E. Weedon Jr. I would like to let you know that I gave Jim Adkins, Michael Falahee's name to come testify on my behalf against William Weedon Jr. I told Mr. Falahee to say that William told him the story about his case, when in fact I told Mr. Falahee what to say. I had Mr. Falahee say this for the fact that I needed someone else's testimony so I could testify against my husband. Mr. Weedon never told anyone else that I know of.

In his letter to this Court, the defendant's counsel claimed that he spoke with Mrs. Weedon, who now lives in Florida, on March 9, 2000, and verified that the notarized letter was written by her and was truthful and voluntarily written. At oral argument on March 14, 2000, the State did not question the authenticity of Mrs. Weedon's letter.

## III

The defendant claims that the Superior Court abused its discretion under Rule 61 by refusing to order either an evidentiary hearing or a new trial. Specifically, the defendant challenges the Superior Court's findings that Falahee's recantation was not truthful and that Mrs. Weedon's testimony regarding the defendant's admission to attacking Ward was admissible.[4] The defendant contends that Falahee's recantation, along with Mrs. Weedon's recent letter and the other affidavits, invalidates the finding that the defendant disclosed the contents of his marital communication to others. Thus, the defendant contends, Mrs. Weedon's testimony regarding that alleged communication was inadmissible.

The State first responds that the portion of the defendant's motion for postconviction relief on appeal is essentially a motion for new trial based on newly discovered evidence. Therefore, the State argues, the defendant's motion should be dismissed as untimely because it was not brought within two years of final judgment as required by Superior Court Criminal Rule 33. Second, the State claims that the defendant's challenge to the admissibility of Mrs. Weedon's testimony was previously adjudicated and that the defendant has not shown any basis for reconsidering the issue in the interest of justice. Finally, the State contends that the Superior Court's determination that Falahee's trial testimony was credible is "manifestly" correct.

## IV

■ In a postconviction proceeding, the decision whether to hold an evidentiary hearing is a determination made by the trial court. *See* Super.Ct.Crim.R. 61(h)(1). Accordingly, we typically review the Superior Court's denial of postconviction relief for abuse of discretion. *See Dawson v. State*, Del.Supr., 673 A.2d 1186, 1190 (1996).

■ We first address the State's claim that the defendant's motion in the Superior Court was time-barred. The State argues that the defendant's motion is time barred under Superior Court Rule 33 because it is essentially a motion for new trial based on newly discovered evidence. Even if Rule 33 applies in a particular case, however, it does not control the question of whether a defendant also can move for a new trial under Rule 61 if the motion can properly be classified as seeking postconviction relief. *See Maxion v. State*, Del.Supr., 686 A.2d 148, 150–51 (1996).

■ While we agree that defendant's challenge to the admissibility of Mrs. Weedon's testimony was previously adjudicated, we find that reconsideration of this issue is warranted in the interest of justice. This Court has held that "[i]n order to invoke the 'interest of justice' provision of Rule 61(i)(4) to obtain relitigation of a previously resolved claim a movant must show that subsequent *legal* developments have revealed that the trial court lacked the authority to convict or punish him." *Flamer v. State*, Del.Supr., 585 A.2d 736, 746 (1990) (emphasis supplied). The present case, however, involves subsequent *factual* developments, and is, thus, distinguishable from *Flamer* where the appellant based "several of his contentions on case law decided after his direct appeal." *Id.*

■ In our view, Rule 61(i)(4)'s bar on previously litigated claims is based on the "law of the case" doctrine. In determining the scope of the "interest of justice" exception, we recognize two exceptions to the law of the case doctrine. First, the doctrine does not apply when the previous ruling was clearly in error or there has been an important change in circumstances, in particular, the factual basis for issues previously posed. *See Ken-*

---

4. The defendant has not appealed the Superior Court's holdings that Clampitt's photographic identification of the defendant was not unduly suggestive and that counsel was not ineffective.

ton v. Kenton, Del.Supr., 571 A.2d 778, 784 (1990) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation."). Second, the equitable concern of preventing injustice may trump the "law of the case" doctrine. See Brittingham v. State, Del.Supr., 705 A.2d 577, 579 (1998).

In the present case, the only witnesses who testified that the defendant disclosed his marital communication, Mrs. Weedon and Falahee, have now apparently recanted. These recantations, in turn, are supported by the affidavits of Sharon Carr, Patricia Woodland, and JoEllen Trader. Moreover, this case presents a more compelling situation than the usual recantation scenarios because the allegedly false trial testimony was used to pierce the marital privilege, a bedrock testimonial privilege codified in D.R.E. 504(a). For these reasons, we conclude that the recantations of Falahee and Mrs. Weedon, viewed in conjunction with the denials contained in the other affidavits, defeats the presumption that the defendant's motion should be procedurally barred.[5]

■ Defendant contends that the Superior Court abused its discretion in not affording him an evidentiary hearing upon submission of affidavits supporting his recantation claims. The Superior Court correctly observed that such motions are often decided based on affidavits and that none of the three situations identified in Blankenship v. State, Del.Supr. 447 A.2d 428, 435 (1982), exist here (i.e., allegations of jury tampering, prosecutorial misconduct, or third party confession). Two ca-

veats, however, are in order. Blankenship and the federal cases from which it adopted the three categories, see e.g., United States v. Hamilton, 5th Cir., 559 F.2d 1370, 1373 (1977), emphasize that the evidentiary hearings usually occur because of "certain unique situations." Although the three recited situations are obviously suggestive of a miscarriage of justice, the need for an evidentiary hearing must be addressed to the specifics of the claim. Moreover, although no specific prosecutorial misconduct is alleged here, it is certainly implied in the affidavits. Indeed, the Superior Court felt compelled to explicitly respond to that implication in a footnote. See Weedon, 1999 WL 458727, at *6 n. 8. In fairness to the prosecutor, as well as to the defendant, that claim should be either proved or dispelled through direct testimony.

■ In evaluating Falahee's testimony, the Superior Court noted that recantations are evaluated under the test announced in Larrison v. United States, 7th Cir., 24 F.2d 82 (1928), which this Court adopted in Blankenship. Under that test, a new trial should be granted when:

(a) The Court is reasonably well satisfied that the testimony given by a material witness is false.

(b) That without it the jury might have reached a different conclusion.

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

Blankenship, 447 A.2d at 433. The Superior Court, however, did not proceed past the first prong because it was not "reason-

---

**5.** Compare Saunders v. State, Del.Supr., 655 A.2d 308, 1995 WL 24888, Walsh, J. (1995) (ORDER). There, this Court held that the "interest of justice" was not satisfied when: the person recanting had existing credibility problems because he was serving a life sentence under a "habitual offender" designation; the defendant offered no reasonable explanation for the sudden recantation; and other substantial evidence existed such that

the jury probably would have reached the same verdict. In contrast, in this case, Falahee has no inherent credibility problems, the defendant has provided a meaningful explanation for Falahee's recantation (he is no longer involved in an intimate relationship with Mrs. Weedon), and there is a serious question whether other evidence is strong enough to support the defendant's conviction.

ably well satisfied" that Falahee's trial testimony was false.

While we agree that a party seeking a new trial on the basis of recantation must satisfy all three prongs of the *Blankenship* test, we observe that the record before the Superior Court did not include Mrs. Weedon's recent affidavit. In the hearing at trial concerning whether the marital privilege would apply, Mrs. Weedon testified that the defendant repeated to several people in the neighborhood what he had told her and that these individuals, in turn, called Mrs. Weedon and told her of the defendant's alleged statements. At the same hearing, this testimony was bolstered by Falahee's testimony claiming that the defendant had told him what he had allegedly done to Ward. It now appears that Mrs. Weedon and Falahee, the only two witnesses who testified that the defendant published his marital communication, have recanted the testimony which provided the basis for the trial court, and this Court, to conclude that the defendant had waived the marital privilege. Together with the affidavits of third parties who refute Mrs. Weedon's claim of waiver, the record mandates, at a minimum, an evidentiary hearing for evaluating the recantation claim.

## V

For the foregoing reasons, we reverse the decision of the Superior Court and remand this matter for an evidentiary hearing.