# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE          )
                          )
          v.              )          ID No. 0706001130
                          )
COURTLAND ROMEO,          )
                          )
          Defendant.      )

## OPINION

Date Submitted: October 19, 2018
Date Decided: February 21, 2019

*Upon Defendant's Supplemental Amended*
*Motion for Postconviction Relief:* **DENIED**

Natalie S. Woloshin, Esquire, Woloshin, Lynch, and Natalie P.A., 3200 Concord Pike, Wilmington, DE 19803, Attorney for the Defendant.

Martin B. O'Connor, Deputy Attorney General, Delaware Department of Justice, Carvel State Building, 820 N. French Street, Wilmington, DE 19801, Attorney for the State.

**JURDEN, P.J.**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................4

II. BACKGROUND ........................................................................................4

  Naimah King ...........................................................................................5

    King's Police Interview ......................................................................6

    King's Trial Testimony .......................................................................6

  Sheila Mayo ............................................................................................8

    Sheila's Police Interview ...................................................................8

    Sheila's Trial Testimony ....................................................................9

    Sheila's 3507 Statement ...................................................................11

  Ray Mayo ..............................................................................................13

    Ray's Police Interview ......................................................................13

    Ray's Trial Testimony .......................................................................17

  Frederick Holden ..................................................................................19

    Holden's Police Interview ................................................................19

    Holden's Trial Testimony .................................................................22

    Holden's 3507 Statement .................................................................23

  Christina Thomas ..................................................................................24

    Thomas's Police Interview ...............................................................25

    Thomas's Trial Testimony ................................................................25

    Thomas's 3507 Statement ................................................................26

III. PROCEDURAL HISTORY .....................................................................27

  Defendant's Claims ..............................................................................29

IV. DISCUSSION ..........................................................................................31

  Standard of Review ...............................................................................31

  Procedural Bars to Postconviction Relief............................................35

  Ground One and Ground Two: Admissibility of Holden and Sheila's 3507
  Statements.............................................................................................38

    The Introduction of Holden and Sheila's 3507 Statements .............38

Detective Solge's Testimony on Holden and Sheila's 3507 Statements ........ 46

Ground Three:  Cross-Examination of King ....................................................... 60

Ground Four:  Ricochet Theory ........................................................................ 62

Rule 61(i)(4) Interest of Justice Exception ...................................................... 65

Ground Five:  Cross-Examination of Holden and Sheila .................................. 73

Ground Six:  Appellate Counsel ....................................................................... 75

**V. CONCLUSION** ......................................................................................... 77

# I. INTRODUCTION

A jury convicted Courtland Romeo ("Romeo")[1] of First Degree Murder and Possession of a Firearm During the Commission of a Felony ("PFDCF") on November 9, 2009.[2] On January 29, 2010, he was sentenced to life imprisonment for Murder First Degree and twenty years for PFDCF.[3]

Before the Court is Romeo's second motion for postconviction relief, filed on May 27, 2014, in which he claims ineffective assistance of trial and appellate counsel.[4] Because his claims are either procedurally barred or otherwise do not entitle him to relief, Romeo's second motion for postconviction relief is **DENIED**.

# II. BACKGROUND

On the evening of June 1, 2007, Wilmington police officers responded to a 911 call near the intersection of South Harrison Street and Elm Street.[5] Upon

---

[1] During police interviews and at trial, witnesses sometimes referred to Romeo as "Doobie."

[2] After a seven-day jury trial, the jury was unable to reach a unanimous verdict on the charges of First Degree Murder or PFDCF. D.I. 42. A retrial was held over five days in November 2009, after which the jury found Romeo guilty of both First Degree Murder and PDFCF. D.I. 64.

[3] Romeo was also indicted for Possession of a Deadly Weapon by a Person Prohibited ("PDWBPP") and Possession of a Firearm by a Person Prohibited ("PFBPP"). The latter charge was dismissed shortly after indictment on July 3, 2007. On December 12, 2008, Romeo moved to sever the PDWBPP charge and have it tried in a simultaneous bench trial. The Court granted the motion to sever, found Romeo guilty of PDWBPP, and sentenced him to seven years and six months at Level V, followed by six months at Level IV. *See* D.I. 42; *see also* D.I. 66.

[4] Def.'s Am. Mot., D.I. 107, Sept. 1, 2016 [hereinafter "Def's Am. Mot."]; Def.'s Reply in Support of Am. Mot., D.I. 115, July 28, 2017 [hereinafter "Def.'s Am. Mot. Reply"]; Def.'s Suppl. Am. Mot., D.I. 133, July 16, 2018 [hereinafter "Def.'s Suppl. Am. Mot."]; Def.'s Reply in Support of Suppl. Am. Mot., D.I. 143, Oct. 19, 2018 [hereinafter "Def.'s Suppl. Am. Mot. Reply"].

[5] *Romeo v. State*, 2011 WL 1877845, at *1-2 (Del. 2011).

arrival, officers discovered a crowd gathered around Antoine Mayo ("Antoine")[6] who was lying in the street, bleeding from his head.[7] Shortly thereafter, an ambulance took Antoine to a hospital where he was pronounced dead.[8] The Deputy Chief Medical Examiner determined that Antoine died from a penetrated gunshot wound to the arm and chest and the injuries that resulted.[9]

**Naimah King**

Naimah King ("King"),[10] the mother of Antoine's son,[11] testified that she, Romeo, and others spent the day drinking alcohol at a friend's house on South Harrison Street.[12] Later that evening, King and Antoine agreed to meet at around 9:30 p.m. near the corner of South Harrison and Elm Street so that he could take her children home.[13] Romeo accompanied King and her children on the walk down the street to meet Antoine.[14] King testified that when they reached Antoine, Romeo and Antoine exchanged words and Romeo smirked at Antoine.[15] After the verbal

---

[6] During police interviews and at trial, witnesses sometimes referred to Antoine as "Antwon," "Twon," or "Toine."

[7] *Romeo*, 2011 WL 1877845, at *1-2 (Del. 2011).

[8] *Id.*

[9] *Id.*; *see also* Trial Tr., D.I. 81, at 43, Nov. 6, 2009 [hereinafter, "11/06/09 Trial Tr."].

[10] At various times throughout the proceedings, King is referred to as "Naimah" King and "Diana" King. For purposes of this opinion, she will be referred to as "King."

[11] King was mistakenly identified as the daughter of Antoine Mayo in the Commissioner's Report and Recommendation from October 19, 2012, which was later affirmed by the Court. *See State v. Romeo*, Del. Super., D.I. 96, ¶ 2 (Jurden, J.) (accepting Comm'r Report of Oct. 19, 2012) (Nov. 19, 2012) (ORDER) [hereinafter "2012 Order"].

[12] Trial Tr., D.I. 82, at 9, Nov. 5, 2009 [hereinafter "11/05/09 Trial Tr."].

[13] *Id.* at 19-20. King has two daughters from a previous relationship, and a son with Antoine.

[14] *Id.* at 21-20.

[15] *Romeo*, 2011 WL 1877845, at *2.

exchange, Antoine's cousin, Ray Mayo ("Ray"), arrived and a physical altercation ensued among the members of the group.[16]

**King's Police Interview**

In her video-recorded interview with police, King said that during the fight "something dropped out of [Romeo's] pocket" and then she realized Romeo was holding a gun.[17] King stated that Romeo first shot at the ground, "[b]ut when he shot at the ground, [Antoine] fell."[18] According to King:

> [Romeo] shot one round. [Antoine] fell 'cause [Romeo] was shooting at the ground first. [Antoine] fell to the ground, so I'm thinking, okay, he just got shot in the leg. He's fine.
>
> . . . .
>
> So I'm just thinking [Romeo] shot his leg. So I'm calling an ambulance, so they can come get [Antoine], and then [Romeo] shot again. He shot three rounds. He shot three rounds. Two at the ground and then he shot again but Antoine was on the ground. He shot again. . . . He shot again and then that's when [Antoine] like completely dropped. Cause [sic] when [Romeo] shot the first two times, Antoine was just crawling on the ground talking about he shot me, he shot me. Then all of a sudden [Romeo] shot the third time and Antoine done fell and rolled over on his back and blood is coming out of his mouth.[19]

**King's Trial Testimony**

At trial, King testified about the fight and subsequent shooting. King testified

---

[16] 11/05/09 Trial Tr. 25-26.

[17] App. for Def.'s Suppl. Am. Mot., D.I. 134, at A400-01 (Naimah King Interview Transcript) [hereinafter "Tr. King Interview"]. The Court has reviewed both the transcript of King's interview with police as provided by Romeo's postconviction counsel and the video-recording. Though the prepared transcript is a fair and accurate transcription of the recorded conversation, the Court relied on the video-recording and referred to the transcript as a listening aid.

[18] *Id.* at A400.

[19] *Id.* at A401-02.

that Antoine hit Romeo, causing Romeo to fall to the ground.[20] After Romeo was struck, King saw the gun on the ground by Romeo. King then watched Romeo grab the gun and start shooting. On direct-examination, King testified as follows:

> Q: Did you notice any objects on the ground after [Romeo] gets struck?
> A: Yes.
> Q: What did you see?
> A: A gun, cigarette, and a lighter.
> . . . .
> Q: The gun, did you see the gun fall?
> A: I heard the gun fall.
> . . . .
> Q: What happens next?
> A: [Romeo] grabbed the gun and shoots.
> . . . .
> Q: And you see the gun go off?
> A: Correct.
> Q: In what direction is the shot when the gun goes off?
> A: Aiming down (indicating).
> Q: You're actually – you have your right arm now, and you're aiming it about a 4 o'clock position; is that right?
> A: Correct.
> Q: How did you know there's actually a bullet that came out?
> A: I saw the sparks off the ground.
> Q: What's the next thing that happened?
> A: He gets his balance and fires again.
> Q: He gets his balance, he fires again, and you made that same motion; was there anything different about the second shot?
> A: It was straight (indicating). He was aiming, like...
> Q: Okay. [Romeo's] arm was straight at this point?
> A: Yes, it wasn't down no more. It was... (indicating).
> Q: And with your arm, you're indicating what's more of the 3 o'clock position, straight across; is that correct?
> A: Correct.
> Q: Okay. And at the end of that, who is in front of that 3 o'clock, as

---

[20] 11/05/09 Trial Tr. 29-30.

your arm points that way?

A: Antoine.

Q: So, then, [Antoine] is standing at this point?

A: Not after the – not after that shot.

Q: Let's be clear: After the first shot, he's standing?

A: Correct.

Q: Now, the second shot, when it's directly across, at 3 o'clock, what do you see next?

A: Antoine falls to the ground saying, "I'm hit."

Q: Are there any other shots?

A: I don't remember.

Q: You don't remember whether or not there were other shots?

A: No.[21]

King's video-recorded interview with police was not played during trial or introduced as evidence.

**Sheila Mayo**

On the evening of June 1, 2007, Antoine and his cousin, Sheila Mayo ("Sheila"), walked down Elm Street toward South Harrison Street to meet King at the corner.[22]

### Sheila's Police Interview

In her video-recorded interview with police, Sheila detailed the moments immediately before the shooting and the shooting itself. Sheila stated that:

Ray was just standing there with [Antoine] and [Antoine] was waiting on [King] to come down the street. . . . I seen [sic] [Romeo] swing off and hit [Ray] and then that's when like they just start [fighting] . . . .

. . . .

[Antoine] was still standing there. . . . I got up off the step and went

---

[21] *Id.* at 30-33.

[22] *State v. Romeo* Trial Tr., D.I. 76, at 172-73, 176-77, Nov. 4, 2009 [hereinafter "11/04/09 Trial Tr."].

up there and was trying to break it up. So I was like stuck in between like five people fighting. . . . So that's when [Romeo], he got up off the ground and pulled out his little gun. He shot at the ground first and then . . . [h]e shot again. When he shot that same time [Antoine] just hit the ground and was like he shot me, but I was thinking he got shot in his leg or something. We don't see no blood right then and [Romeo] shot again and that's when we seen [sic] blood start pouring out [of Antoine's] mouth.[23]

**Sheila's Trial Testimony**

At trial, Sheila testified about the events leading up to the shooting. In particular, she testified that before any shots were fired, "[Romeo] had the gun out and looked at [Antoine]" and then said to Antoine, "What are you going to do now?"[24] Then, with respect to the shooting, Sheila testified:

Q: How did you become aware that there was a gun at the scene?
A: Cause [sic] after the fight, [Romeo] pulled out a gun.

. . . .

Q: [D]id you see [Antoine] strike [Romeo]?
A: Yes. When he pulled the gun out, that's when [Antoine] strike [sic] him.
Q: What was [Romeo's] reaction?
A: He fell and got up and started shooting.

. . . .

Q: Did you see the gunfire?
A: Yes.
Q: And how many shots did you hear?
A: Three.
Q: [H]ow many of those shots did you see fire out [sic] the gun?
A: One.
Q: And in what order was the one that you saw?
A: The first one.
Q: And did you see who was holding the gun?

---

[23] App. for Def.'s Suppl. Am. Mot., D.I. 134, at A382-83 (Sheila Mayo Interview Transcript) [hereinafter "Tr. Sheila Interview"].
[24] 11/04/09 Trial Tr. 232.

9

A: Yes.

Q: And who was that?

A: [Romeo].

Q: Did you see the position of his arm when he was holding the gun for the first shot?

A: Yes.

Q: And what position was that?

A: Like pointing towards the ground.

. . . .

Q: And what was [Antoine's] reaction to the shot?

A: He told me he had been shot.

Q: Okay. Did you see [Antoine] fall?

A: Yes.

Q: Did you see any blood on [Antoine]?

A: Yes.

Q: Where did you see the blood on [Antoine]?

A: Coming out [sic] his mouth.

. . . .

Q: [D]o you remember what span of time it took for the three shots that you heard to be fired? Is it a long time? Is it a short time?

A: A short time.

Q: Okay, and was it within a couple of seconds or --

A: Yes.

Q: -- a minute --

A: -- a couple of seconds.

Q: A couple of seconds. Do you remember the succession of it? [W]ere there any pauses between the gunfire?

A: Yes.

Q: And if you can, using a pow-pow, you know, however it was, if you can explain to the jury the succession of the shots, adding any pauses.

A: It was pow, then pow-pow.

Q: So, it was that fast?

A: Yes.

. . . .

Q: [Y]ou said you saw blood coming out of [Antoine's] mouth. Where was he positioned when you saw that?

A: He was laid [sic] on the ground.

. . . .

Q: Okay. Did you speak with the police at Wilmington Police

10

Department?
A: Yes.

. . . .

Q: Did you go to Wilmington Police voluntarily?
A: Yes.
Q: And do you remember speaking with Detective Solge?
A: Yes.
Q: Did you tell him everything that you remember that you had just seen?
A: Yes.
Q: And was that to the best of your recollection?
A: Yes.

. . . .

Q: You said you saw the first shot fired, and the gun was pointing down. Did you see anything hit the ground?
A: No.[25]

Sheila's video-recorded interview with police was not played at trial or introduced as evidence.

### Sheila's 3507 Statement

Prior to the conclusion of Sheila's direct-examination, the State called the Chief Investigating Officer, Detective Solge ("Det. Solge") of the Wilmington Police Department, to testify about Sheila's out-of-court statement to police pursuant to 11 *Del. C.* § 3507 ("Section 3507").[26] On direct-examination, Det. Solge testified that Sheila told him the following:

Q: And did [Sheila] tell you whether or not she saw the – the person firing the gun?
A: She did.

---

[25] *Id.* at 189-94, 199-202.
[26] *Id.* at 199; *see* 11 *Del. C.* § 3507(a) ("In a criminal prosecution, the voluntary out-of-court prior statements of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.").

Q: And did she tell you whether or not she saw the second shot fired?
A: She did.
Q: And did she tell you how she saw the second shot being fired?
A: She was directly looking at the shooter at the time he discharged the round.
Q: And did she tell you what the shooter's arm position was –
A: Yes.
Q: -- when he discharged the second round?
A: Yes.
Q: And what did she tell you?
A: Directly at [Antoine].
Q: Did she tell you whether or not she saw subsequent shots fired?
A: Yes.
Q: And did she tell you whether or not she saw the arm position of the shooter when the subsequent shots –
A: Yes, again [Antoine].
Q: Did you ask [Sheila] if she could identify the shooter?
A: Yes.
Q: And was she able to identify the shooter?
A: Yeah, she was.
Q: And how was she able to do that?
A: Through a photographic lineup.
Q: Detective, when [Sheila] told you that the second shot was pointed directly at Antoine Mayo, did she tell you what Antoine Mayo's position was at the time?
A: Standing upright in the street.
Q: Did she tell you that she saw [Antoine] fall?
A: Yes, she did.
Q: [D]id she tell you after which shot she saw [Antoine] fall?
A: The second shot, I believe.[27]

On cross-examination, Romeo's trial counsel ("Trial Counsel") elicited the

following testimony from Det. Solge regarding Sheila's interview with police:

Q: Detective, when you interviewed [Sheila], were you by yourself or were you with any other police officers?
A: There were two – I guess you would – it would be safe to say there

---

[27] 11/04/09 Trial Tr. 200-01.

12

were two separate interviews of [Sheila], one with Detective Ciratella. I believe he was by himself with [Sheila] . . . and he exited the [room] and I went back in and interviewed her.

Q: For Detective Ciratella's interview, were you somewhere where you could see that interview, or were you doing something else in the investigation?

A: I was conducting another interview.

Q: And so when you came in, had Detective Ciratella already advise[d] you . . . of what [Sheila] had been saying, or did you just start fresh?

A: He advised me beforehand, before I conducted the second interview.[28]

Noting that Det. Solge was struggling to recall "what it is that [Sheila] had to tell him," Trial Counsel had him review the transcript of Sheila's police interview.[29] After Det. Solge reviewed it, Trial Counsel questioned him about the details of Sheila's police interview, including relevant statements that appeared to conflict with her trial testimony.[30]

## Ray Mayo[31]

### Ray's Police Interview

In his interview with police, Ray stated that on the evening of June 1, 2007, he received a call from his ex-girlfriend who informed him that Antoine was "getting in an argument with some boy."[32] Ray then called Antoine to "see what

[28] *Id.* at 202-03.

[29] 11/04/09 Trial Tr. 211. The transcript provided to Det. Solge of Sheila's video-recorded interview with police was prepared by Trial Counsel and contained "both the comments and the investigative work of Detective Ciratella and . . . Detective Solge coming in." *Id.*

[30] *Id.* at 213-15, 219.

[31] Siblings Ray Mayo and Sheila Mayo are cousins of Antoine Mayo. *See id.* at 172; *see also* 11/05/09 Trial Tr. 75.

[32] App. for Def.'s Suppl. Am. Mot., D.I. 134, at A420 (Ray Mayo Interview Transcript) [hereinafter "Tr. Ray Interview"]. During his interview with police, Ray refers to the shooter as

13

happened," and Antoine told him "some boys [sic] trying to murder me . . . I need you to come home right now."[33] After arriving to the area of Elm and South Harrison Streets, Ray headed toward Antoine who was sitting on the front of a car parked on the street and talking on the phone with King to pick up their son.[34] Ray stated that, before King arrived, the shooter "appeared out of nowhere."[35] Ray told police:

> [T]he whole time I'm standing there talking to [Antoine], [the shooter] is running his mouth and he's on his phone and he takes off his shirt . . . but he done call his friends down here by then.
>
> . . . .
>
> So the boys come around there. I don't even know these boys who [the shooter] was with. They come running up and by then [Sheila] is pulling me out in the street talking about some no, no, no, but [the shooter] ran up on [Sheila] and swung over [Sheila] and that's how the whole little fight started. [The shooter] swung on [Sheila] and hit me and me and him started fighting and then somebody hit me from behind and somebody hit me from the side and . . . [t]hey was jumping

the "boy," "boy with the gun," and "shooter." To avoid confusion, the Court has substituted "the shooter" for these references.

[33] *Id.* The Court notes the following exchange which occurred immediately after Ray detailed the abovementioned phone conversation with Antoine:

> Q: Wait. . . . I don't mean to cut you off when I stop you. It's just I want to understand what you just said. What do you mean he was on the phone, they want to murder him?
> A: I guess since he figured he was by his self [sic] and –
> Q: Well let me ask you. I mean is it . . . is that slang for something, or did he mean?
> A: He really meant it.
> Q: Ok.
> A: Like he really like he was talking to me like . . . something was really wrong like come home right now. I said alright I'm on my way.

*Id.*
[34] *See* Tr. Ray Interview A430.
[35] *Id.*

14

on me and . . . I didn't know what was going on around me besides me getting jumped.[36]

Ray stated that the shooter pulled a gun on Sheila, prompting Antoine to push Sheila out of the way while simultaneously using his other hand to strike the shooter.[37] Ray described the events surrounding the shooting as follows:

Q: So Antoine did hit the guy with the . . . gun?
A: Yeah. By this time [the shooter] had the gun and he had it on [Sheila]. So [Antoine] hit him and [Antoine] stumbled back and then [the shooter] shot one and I saw it ricochet off the ground and then he shot three more times.
Q: He shot at the ground?
A: Yeah. Like the first shot it ricocheted off the ground. I saw it and then I saw him shoot like three, three more times and then I just saw [Antoine] collapse over.
. . . .
Q: Ok. How many shots did you see him fire?
A: I saw four.
Q: Four?
A: Yeah I saw four (inaudible).
Q: You, you said earlier that um, or you just said that the first shot you saw ricochet?
A: Yeah I saw that ricocheted cause [sic] as I was across the street.
Q: How was he holding the gun? I mean was he pointing it right down?
A: Yeah he had it just like this.
Q: Did he say anything?
A: Basically, . . . I ain't really hear him say nothing. I mean [Sheila] said he said something to her, but I didn't really hear him say nothing. After [Antoine] hit him he just fired. So the gun um, the bullet ricocheted up and then he just shot some more and then that's when [Antoine] collapsed over . . . .
Q: Now where was he pointing the gun at after the first shot? When he fired the additional ones, where was he pointing at?

---

[36] *See* Tr. Ray Interview A422.
[37] *Id.*

15

A: After the first shot that's when it was like right here where my like back towards [Antoine's] back . . . like directly in.

Q: How far away was Antoine from the shooter?

A: Three feet, maybe four. It was close range.

. . . .

Q: During this time when Antoine got shot did you see anybody else with any handguns, any weapons?

A: (Shaking head no).

Q: But you're saying you saw four shots?

A: Yeah. I saw the shots.

Q: How do you know they were coming from the shooter?

A: Cause [sic] I saw him as he was. I saw him. I actually saw him shooting. (Inaudible) As I backed up I was actually looking at my cousin [Antoine] the whole time I was backing up and I thought my cousin was running, but he never ran I guess.

. . . .

Q: Did you see anything coming out of the gun?

A: Basically, yeah I just saw like little, you know how like it ain't no color like as you fire the gun. Like I saw like.

Q: Like flashing?

A: Yeah like flashes (inaudible) I saw flashes and they, they said the first bullet ricocheted up and hit him. I guess (inaudible) so like I just saw him collapse over and that's when everybody ran into the street.[38]

Later in the interview, Ray further described the manner in which the shots were fired, stating:

Q: Well earlier you said [the shooter] shot one time . . . to the ground right?

A: Yeah. The first bullet ricocheted up.

Q: You said earlier he fired how many rounds?

A: Four.

Q: Four, ok. (Inaudible) four rounds and the handgun was pointing down?

A: Yeah.

. . . .

Q: But you know the bullet impacted the street right?

---

[38] *Id.* at A423-25.

16

A: Yeah I saw that. I saw the impact.

Q: When [Antoine] collapsed in the street, how far away was the point where [the shooter] shot at the street?

A: Basically right there. Like.

Q: If you had to guess, how many feet?

A: Not even feet (inaudible) he shot and it hit the ground. [Antoine] never moved from there.

Q: So what happens after he fires in the street? What is Antoine doing? What is the shooter doing?

A: I saw him still (inaudible) and then I saw the shooter shooting more. He was shooting. He shot again.

. . . .

Q: So you indicated earlier it's about three to four feet away?

A: Yeah.

Q: Now we know just by from your statements you said he fired a total of four rounds (inaudible) the street and by your statement, obviously there's three rounds. How many rounds did you see him fire at Antoine?

A: I saw every shot he took.

Q: So he shot three times at Antoine?

A: Yeah.

Q: Once at the street, but three times at Antoine?

A: (Shaking head yes).[39]

During this interview, Police presented Ray with a six-person photographic lineup. Ray, who told police that he had never seen Romeo before the evening in question, identified Romeo from the photographic lineup as the one "who had the gun" and "shot [Antoine]."[40]

**Ray's Trial Testimony**

At trial, Ray testified about the fight and the subsequent shooting. Ray

---

[39] Tr. Ray Interview A436-37.

[40] *Id.* at A426-27. In his interview with police and his trial testimony, Ray stated that he did not know the shooter and he had never met him before that night. *See id.* at A422; *see also* 1/05/09 Trial Tr. 83-84.

testified that Antoine used his left hand to push Sheila out of the way while using his right hand to strike Romeo.[41] Following the strike, Antoine staggered and took a step back as though he was leaving, all while maintaining his gaze on Romeo.[42]

Ray then testified as follows:

> Q: What happens next?
> A: A gunshot goes off into the ground.
> Q: When you say "a gunshot goes off into the ground," tell us what you saw.
> A: I seen [sic] sparks fly and a bullet ricochet off the ground.
> Q: Where were the sparks coming from?
> A: From the gun that the defendant was holding, the gun.
> Q: Do you remember what hand he's holding it in?
> A: No.
>
> . . . .
>
> Q: Okay. The gunshot that you see, you say the first is in the ground; right?
> A: Yes.
> Q: How do you know it's in the ground?
> A: I seen [sic] the bullet ricochet off the ground.
> Q: How close is the ricochet to [Antoine]?
> A: About a foot, maybe a foot in front of him.
> Q: Now, when the flash comes out of the gun, are you able to see what the angle of the shot is, just from a flash?
> A: Well, it was pointed down at the ground. The gun was pointed down at the ground.
> Q: You just used your hand, and can you tell us what that angle would be that you saw him?
> A: Maybe a 45-degree angle.
>
> . . . .
>
> Q: When that first shot hits the ground, does Antoine react?
> A: No, he just stood there.
>
> . . . .
>
> Q: Is there a second shot?

---

[41] 11/05/09 Trial Tr. 93-94.
[42] *Id.* at 95.

18

A: Yes.

Q: Tell us about the second shot.

A: Right after the first shot went off into the ground, the defendant raised his arm, pointed the gun at Antoine, and shot about three more times.

Q: When you say "raises his arm," can you show with your arm how he raised it?

A: (Indicating).

Q: Okay. Up, and you're pointing basically horizontally; correct?

A: Yeah.

Q: How many shots after he raises his arm?

A: About three.

Q: About three? Can you give an idea, in seconds, how long it is after the first shot to the second?

A: Maybe two to three seconds.

Q: The shots from the second shot on, are they slow or are they fast?

A: Rapid.

Q: What does [Antoine] do?

A: He collapsed.[43]

Ray's video-recorded interview with police was not introduced as evidence or played at trial.

**Frederick Holden**

On the evening of June 1, 2007, Frederick Holden ("Holden") was with Ray when Ray and Antoine spoke on the phone.[44] After the call, Ray communicated to Holden that they needed to get back to Elm and South Harrison quickly.[45]

**Holden's Police Interview**

During Holden's audio-recorded interview with police, he stated that he and

---

[43] *Id.* at 95-99.

[44] *See* 11/04/09 Trial Tr. 94-95; *see also* App. for Def.'s Suppl. Am. Mot., D.I. 134, at A351-52 (Frederick Holden Interview Transcript) [hereinafter "Tr. Holden Interview"].

[45] *See* 11/04/09 Trial Tr. 96-97; *see also* Tr. Holden Interview A348.

19

Ray arrived at South Harrison Street near Elm Street where Antoine and an unknown female were waiting for King to arrive with her children.[46] Shortly after Holden arrived, the shooter "just walked up. . . didn't really say nothing" and Antoine and the shooter began to argue.[47] Holden believed that the argument stemmed from a dispute that had begun before he and Ray had arrived.[48] After Ray began arguing with the shooter, Holden told police that approximately four unknown individuals came outside and towards Antoine.[49] Suddenly, according to Holden, Ray and the shooter were "in each other's face" and began to fight.[50] Holden told police that he became involved in the fight to help Ray after noticing the unknown individuals had joined in the fight and appeared to be targeting Ray.[51] After the fight settled, Holden told police that Ray was angry about the fight and headed back toward the shooter. Holden then described the events immediately leading up to the shooting as follows:

> [Ray] started walking back towards . . . the shooter and . . . I turned around to go follow behind him.
>
> . . . .
>
> [Ray and the shooter] start fighting again. So once they start fighting . . . I turned around and start going back over there and then I heard [Antoine] say didn't he tell you get off of 'em and [Antoine] start

---

[46] Tr. Holden Interview A351-52.

[47] *Id.* at A352-54. During his interview with police, Holden refers to the shooter as the "dude that does the shooting," "dark skin boy," "dark skin dude," and "shooter." To avoid confusion, the Court has substituted "the shooter" for these references.

[48] *Id.* at A354.

[49] *Id.* A355.

[50] *Id.* at A356-57.

[51] *Id.* A357-58.

20

hitting [the shooter] . . . to try [to] break [Ray and the shooter] up cause [sic] I guess [Antoine] got mad and started hitting on the shooter and then next thing you know the shooter pushed back and start[ed] shooting.[52]

Holden stated he never saw the gun because it was dark outside, but he assumed it was a gun after he heard the shot and saw "the spark" that "seem[ed] like right in front of his hand."[53]   When asked about the details of the shooting, Holden explained:

> Q: Okay you said earlier that you only saw one shot?
> A: Yes . . . cause [sic] I was facing that way when [the shooter] had pushed him back that I seen that.
> . . . .
> Q: Push off of who?
> A: [The shooter] pushed off of Ray and Antoine cause [sic] they had started fighting.
> Q: Okay.
> A: And once he pushed off I seen the first shot . . . .
> Q: Did you see where the gun came from?
> A: No, I did not. I just, just like I don't know like all in one motion when he pushed off he had it already out cause [sic] when he pushed off he's like two steps back. He was like real close steps like boom, boom, shot the first one like I didn't think they shot him because the first shot was like towards the ground.
> . . . .
> Q: The spark was going from up down towards the street?
> A: On an angle like towards the street.
> Q: Okay.
> A: Because he like pushed off on an angle and the first shot went off. But after the first shot went off was like towards the ground so I turned around and I started running. . . . [O]nce I started running I heard, I heard three more shots.
> Q: Okay so you're indicating that there was a total of four shots?

---

[52] Tr. Holden Interview A358.
[53] *Id.* at A359-60.

21

A: Yes, that's all I heard was four shots but like the fourth shot I was opening my door and coming in my house . . . .[54]

At the conclusion of his interview, Police presented Holden with a six-person photographic lineup.[55] Holden explained to police: "I didn't really get to see [the shooter's] facial features cause [sic] . . . I had took my glasses off just in case firsts would start flying towards my face I didn't want my glasses to get broken."[56] Holden was unable to identify the shooter from the photographic lineup.[57]

**Holden's Trial Testimony**

On direct-examination at trial, Holden testified about the shooting as follows:

Q: [W]ere you facing the direction of the gunshots?
A: No. . . .

. . . .

Q: [W]ere you able to tell the direction that the gunshots were coming from?
A: No. They was behind me, because I didn't see nothing in front of me.
Q: Okay, and how many gunshots did you hear?
A: By the time I hit my door, probably heard like three gunshots.

. . . .

Q: Did you notice whether or not anybody was struck by the gunshots?
A: Not at first, but once I came back the next day –

. . . .

Q: [W]hat was your estimate of how many gunshots you heard?
A: I heard about four.[58]

Also during direct-examination, Holden confirmed he had voluntarily spoken

---

[54] Id.
[55] Tr. Holden Interview A363-66.
[56] Id. at A363.
[57] 11/04/09 Trial Tr. 127.
[58] Id. at 115-20.

to police about what he saw on the evening of the shooting:

> Q: Did you eventually speak with Wilmington Police about what you saw that evening?
> A: Yes.
> Q: Did you speak with Detective Solge?
> A: Yes.
>
> . . . .
>
> Q: Did you speak to him voluntarily?
> A: Yes.[59]

During Holden's cross-examination, Trial Counsel elicited the following

testimony:

> Q: The prosecutor asked you some questions earlier about what happened back on June 1st, 2007, correct?
> A: Yes, yes.
> Q: And the prosecutor also asked you some questions about you talking with Detective Solge two days later on Sunday, June 3rd, 2007, correct?
> A: Yes, yes.
>
> . . . .
>
> Q: And when you were talking to Detective Solge, were you telling him the truth?
> A: Yes.
> Q: And under oath today, have you been telling the truth?
> A: Yes.[60]

Holden's audio-recorded interview with police was not played at trial or

introduced as evidence.

**Holden's 3507 Statement**

The State called Det. Solge to testify about Holden's statements from his

---

[59] 11/04/09 Trial Tr. 121-22.
[60] *Id*. at 134.

interview with police pursuant to Section 3507. Det. Solge testified that during his interview with police, Holden said the following:

> Q: And when [Holden] spoke with you, did he tell you whether or not he saw any gunfire?
> A: He said – he stated he did see gunfire.
> Q: And how did he tell you he saw gunfire?
> A: He saw the – I believe he described – or he used the term "the shooter." He didn't actually see the weapon itself, as he – Mr. Holden testified before he did not have his glasses on, but he did see fire coming from [the shooter's] hand, and I believe there was a dark object in it.
> Q: And did Mr. Holden tell you how many of these fires that he saw coming from the gun that he saw?
> A: Approximately four shots fired.
> Q: Okay, and did Mr. Holden tell you whether or not he saw the direction of the first gunshot fired?
> A: He stated the first shot struck the ground or was towards the ground.
> Q: Did he tell you the direction of the second shot that he saw?
> A: Yes, towards [Antoine].
> Q: All right. Did Mr. Holden tell you in his interview that he had seen Antoine Mayo out there that night?
> A: Yes, he did.
>
> . . . .
>
> Q: Was Mr. Holden able to identify the shooter for you?
> A: No, he was not.[61]

**Christina Thomas**

On the night of the shooting, Christina Thomas ("Thomas") was visiting a house on South Harrison Street.[62] At the time of Antoine's death Thomas was nine years old.[63] In its May 13, 2011 opinion affirming Romeo's conviction, the

---

[61] 11/04/09 Trial Tr. 125-27.
[62] *Romeo*, 2011 WL 1877845, at *3 (Del. 2011).
[63] *Id.*

24

Delaware Supreme Court discussed in detail Thomas's interview with police and trial testimony, as well as Det. Solge's testimony of her statement to police ("3507 Statement").[64] The summary below is drawn from the opinion of the Supreme Court.[65]

**Thomas's Police Interview[66]**

During Thomas's interview with police, the following exchange occurred:

Solge: Ok. Um, the same guy who fired the gun and this is very important. The same guy who fired the gun, is he the same person that had the bottle of beer? Could you tell that, or no?
Thomas: (Shaking head no)
Solge: No you can't tell?
Thomas: I can't tell.
Solge: You can't tell. Ok. You're just not sure?
Thomas: Uh huh.
Solge: Ok. That's fine. . . .

**Thomas's Trial Testimony[67]**

Thomas testified that she heard some men arguing outside of the house that she was visiting the night of June 1, 2007. Thomas testified that she looked out of the window of the house and saw several men. Thomas also testified that she saw one of the men drink from a beer bottle, place the beer bottle on the steps of the house next door, and then say "Let's get it popping." Thomas testified that the man who drank from the beer bottle was wearing a white t-shirt and was involved in the

---

[64] *Romeo*, 2011 WL 1877845, at *3-10.
[65] *Id.*
[66] *Id.* at *4.
[67] *Romeo*, 2011 WL 1877845, at *3-4.

25

events that night. Thomas also testified that she observed a man in a black t-shirt fire a weapon three or four times that night.[68]

Thomas's video-recorded interview with police was not played at trial or introduced as evidence.

### Thomas's 3507 Statement[69]

Thomas's interview with Det. Solge was admitted into evidence pursuant to Section 3507. The following exchange occurred during direct-examination of Det. Solge:

> Q: Do you recall whether or not Christina Thomas was able to tell you whether the same person who put the beer bottle down was the same person who was the shooter?
> A: That is correct.
> Q: Do you recall what she said about that?
> A: She said the same person who had the beer bottle was the shooter.

The next relevant exchange occurred during Trial Counsel's cross-examination of Det. Solge:

> Q: And [the prosecutor] showed you a portion of a transcript of th[e] statement [Thomas] gave you . . . correct?
> A: Yes, sir.
> Q: And the one question that she pointed out to you was a question where you were saying can you be sure that the person that put down the beer bottle was not the shooter, right?

---

[68] At Romeo's trial, Sergeant Alfred Filippone testified that a fingerprint was lifted from the beer bottle that was left on the steps of the house adjacent to where Thomas was visiting. Filippone further testified that the fingerprint lifted from the beer bottle matched the fingerprint of Romeo's left thumb. *See id.* at *4; *see also* 11/04/09 Trial Tr. 82. The State also presented expert testimony that the DNA taken from that beer bottle matched Romeo's. *See Romeo*, 2011 WL 1877845, at *4; *see also* 11/06/09 Trial Tr. 12-18.

[69] *Romeo*, 2011 WL 1877845, at *4-5.

A: Correct.
Q: And she said she couldn't be sure, right?
A: Yes, sir.

## III. PROCEDURAL HISTORY

Following Romeo's conviction on November 9, 2009, he filed an appeal through new counsel ("Appellate Counsel").[70] On appeal, Romeo argued that his conviction should be reversed because Det. Solge committed perjury during his testimony on Thomas's 3507 Statement.[71] According to Romeo, Det. Solge's testimony about Thomas's 3507 Statement in the first trial (the mistrial) was inconsistent with his testimony about Thomas's 3507 Statement in the second trial, in which Romeo was convicted. In support of this argument, Romeo argued:

> [A] witness [Thomas] described the defendant by what he was carrying or not carrying. If the defendant was carrying the bottle, he was the shooter[.] If he was not carrying the bottle, he was not the shooter. In the first trial, in January of 2009, the witness stated the defendant was not carrying the bottle and therefore, he was not the shooter. However, in November of 2009, the defendant was carrying the bottle and thus he was the shooter.[72]

---

[70] D.I. 67. Trial Counsel moved to withdraw his representation on appeal and filed an opening brief pursuant to Supreme Court Rule 26(c). *See* Sup. Ct. R. 26(c) ("If the trial attorney, after a conscientious examination of the record and the law, concludes that an appeal is wholly without merit, the attorney may file a motion to withdraw."). The Supreme Court granted Trial Counsel's motion and new counsel was appointed for the direct appeal. *See Romeo*, 2011 WL 1877845, at *7 (Del. 2011) ("After reviewing the record, we could not conclude that Romeo's appeal was wholly without merit and so totally devoid of any arguably appealable issue that it could be decided without an adversarial presentation.").

[71] *Romeo*, 2011 WL 1877845, at *7 (Del. 2011). This was the only issue Romeo raised in his direct appeal. *See id.* at *1.

[72] Appellant's Opening Brief, 2011 WL 1474807 (Del. 2011); *see also* App. for Def.'s Am. Mot., D.I. 108, at A273.

The Supreme Court was not persuaded by Romeo's argument and affirmed the judgment of the Superior Court on May 13, 2011. The Supreme Court held:

> Romeo has not shown that Solge intentionally made, or the State knowingly used, a false statement. Although Solge's response on direct examination was inaccurate, defense counsel elicited a contrary (and accurate) response on cross examination. . . . In these circumstances, we conclude that Romeo has not shown plain error.[73]

Ten months later, on March 14, 2012, Romeo filed a *pro se* Motion for Postconviction Relief ("First Motion")[74] alleging: (1) he was denied a fair trial because his conviction was based, in part, on the perjured testimony of Det. Solge;[75] (2) Trial Counsel was ineffective;[76] and (3) Appellate Counsel was ineffective.[77]

---

[73] *Romeo*, 2011 WL 1877845, at *9.

[74] Def.'s Mot., D.I. 87 (Mar. 14, 2012) [hereinafter "Def.'s First Mot."]. Romeo filed a letter requesting appointment of counsel prior to filing the First Motion. D.I. 85. That request was denied for failure to show good cause. D.I. 86.

[75] Supporting facts included: "Prosecutor when shown on direct exam failed to correct a known false and misleading testimony made by the states [sic] chief investigating officer in states [sic] rebuttal. Thus violating my 14th Amendment due process Right [sic]." Def.'s First Mot.

[76] Supporting facts included:

> (1) Counsel err [sic] when he did not object on direct Exam or question on cross-exam the fact that the detective had in fact made a false and misleading testimony. Thus falling blow [sic] an objective stand [sic] of reasonableness. (2) Counsel Err [sic] in not putting up a [sic] adequate defense on the state theory of intent thus violating the 6th Amendment. (3) Counsel failed to confront states [sic] witness's [sic] with their actual out of court statements for the purpose of impeachment and discrediting the state theory of intent. (4) Counsel failed to cross-examine Dr. Perlman on her finding of the gun shot [sic] wound wear [sic] she found that it enter [sic] in a leftward slightly down. Where there's testimony that the gun was pointed directly at [Antoine] at 3 o'clock Dr. Perlman [sic] finding will be inconsistent with the witness's testimony.

Def.'s First Mot.

[77] Supporting facts included: "Appellant counsel failed to do any investigative work on appeal only raising what he looked at as a sure win on appeal overlooking everything else [sic]." *Id.*

28

Pursuant to 10 *Del. C.* § 512(b) and Superior Court Criminal Rule 62, the First Motion was referred to a Commissioner for Proposed Findings of Facts and Conclusions of Law.[78] On November 19, 2012, this Court affirmed the Commissioner's Report and Recommendation Dismissing in Part and Denying in Part Romeo's First Motion for Postconviction Relief.[79] Romeo did not appeal.

On May 27, 2014, Romeo filed a second *pro se* Motion for Postconviction Relief ("Second Motion")[80] and for Appointment of Counsel.[81] The Court granted the latter and counsel was appointed on January 30, 2015.

**Defendant's Claims**

Romeo's Second Motion asserts six grounds for postconviction relief, all of which are premised on ineffective assistance of counsel. These claims are fairly summarized as follows:

**Ground One:** Trial Counsel was ineffective for: (a) failing to object to Holden's out-of-court statements that were inadmissible pursuant to Section 3507 because the State failed to establish the proper foundation; and (b) failing to object to Det. Solge's interpretive narrative of Holden's statements.

---

[78] *See* 10 *Del. C.* § 512; Del. Super. Ct. Crim. R. 62.

[79] *See* 2012 Order ¶ 34. Romeo's First Motion was summarily dismissed as to ground one and denied as to all other grounds.

[80] D.I. 100. Romeo filed an Amended Motion for Postconviction Relief on September 1, 2016. *See* D.I. 103.

[81] D.I. 101.

Romeo alleges that these failures prejudiced the defense.[82]

**Ground Two**:  Trial Counsel was ineffective for: (a) failing to object to Sheila's out-of-court statements that were inadmissible pursuant to Section 3507 because the State failed to establish the proper foundation; and (b) failing to object to Det. Solge's interpretive narrative of Sheila's statements. As with Ground One, Romeo alleges these failures prejudiced the defense.[83]

**Ground Three**:  Trial Counsel failed to effectively cross-examine King. Romeo argues that "[i]t was essential that trial counsel cross examine King with her out-of-court statement in order to attack her credibility" and that Trial Counsel's "[f]ailure to cross-examine King effectively resulted in prejudice."[84]

**Ground Four**: Trial Counsel was ineffective for failing to present the theory that it was a reckless (and therefore not an intentional) killing because the bullet was shot into the ground and ricocheted into the victim (the "Ricochet Theory").  Romeo further argues that Trial Counsel's failure to utilize the out-of-court statements of Sheila, King, Holden and Ray to support the

---

[82] Def.'s Am. Mot. 11-14, 16-17; *see also* Def.'s Am. Mot. Reply 3-6.
[83] Def.'s Am. Mot. 14-17; *see also* Def.'s Am. Mot. Reply 3-6.
[84] Def.'s Am. Mot. 17-19; *see also* Def.'s Am. Mot. Reply 6-7.

Ricochet Theory was ineffective.[85]

**Ground Five**: Trial Counsel was ineffective for failing to use the out-of-court statements of Holden and Sheila to undermine their credibility as witnesses and to challenge the State's theory of an intentional killing. Romeo contends Trial Counsel's failures resulted in prejudice because, "had trial counsel presented these inconsistencies to the jury, they would not have found Mr. Romeo guilty of Murder in the First Degree."[86]

**Ground Six**: Appellate Counsel was ineffective for failing to raise the issues that Trial Counsel failed to raise, as alleged in Grounds One through Five. Romeo alleges that Appellate Counsel raised only the issue of Det. Solge's perjured testimony, which could not be raised on appeal given that Trial Counsel did not object to the perjured statement at trial. Romeo argues that he was prejudiced by Appellate Counsel's failure to raise the aforementioned issues on appeal.[87]

## IV. DISCUSSION

**Standard of Review**

Superior Court Criminal Rule 61 ("Rule 61") controls a Motion for

---

[85] Def.'s Suppl. Am. Mot. 2-9; *see also* Def.'s Suppl. Am. Mot. Reply 7-11.

[86] Def.'s Suppl. Am. Mot. 9-14.

[87] Def.'s Am. Mot. 20-21; *see also* Def.'s Am. Mot. Reply 8.

31

Postconviction Relief.[88]    Before considering the merits of a motion for postconviction relief, the Court must first address the procedural requirements of Rule 61.[89]    If the Court determines that a postconviction claim is procedurally barred, then it shall not consider the merits of the claim.[90]

At the time Romeo filed the Second Motion in May 2014, Rule 61 provided that a claim was procedurally barred if: (1) the motion was filed more than one year after the judgment of conviction was final;[91] (2) the claim was not asserted in a prior postconviction motion, unless consideration of the claim is warranted in the interest of justice;[92] (3) the claim was not raised in the proceedings leading to conviction, unless the claimant shows cause for relief from the procedural default and prejudice from the violation of his rights;[93] and (4) the claim was previously adjudicated in a proceeding leading to the conviction, unless the interest of justice requires reconsideration.[94]

The "Former Adjudication" procedural bar of Rule 61(i)(4) may be overcome

---

[88] Super. Ct. Crim. R. 61 (effective Feb. 1, 2014) [hereinafter "Rule 61"].  Because Romeo's Second Motion was filed May 27, 2014, it is controlled by the version of Rule 61 which took effect on February 1, 2014. *See Bradley v. State*, 135 A.3d 748, 757 (Del. 2016) (holding that the Court applies the version of Rule 61 in effect at the time the motion was filed).

[89] *Bailey v. State*, 588 A.2d 1121, 1127 (Del. 1991); *see also Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

[90] *Younger*, 580 A.2d, at 554 (Del. 1990).

[91] Super. Ct. Crim. R. 61(i)(1) (2013).

[92] Super. Ct. Crim. R. 61(i)(2) (2013).

[93] Super. Ct. Crim. R. 61(i)(3) (2013).

[94] Super. Ct. Crim. R. 61(i)(4) (2013).

when "reconsideration of the claim is warranted in the interest of justice" (often referred to as the "interest of justice" exception).[95] Similarly, Rule 61(i)(5) provides that the Rule 61(i)(1), (2), and (3) procedural bars are inapplicable when a colorable claim is made "that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of convictions."[96] This narrow exception is referred to as the "miscarriage of justice" exception and applies only in limited circumstances.[97] Accordingly, reconsideration of a claim barred by Rule 61(i)(1)-(3) is warranted where a colorable claim under Rule 61(i)(5) is presented.[98]

Claims of ineffective assistance of counsel are governed by the two-part test set forth by the United States Supreme Court in *Strickland v. Washington*[99] and adopted by the Delaware Supreme Court in *Albury v. State*.[100] For a claim to succeed under *Strickland*, a defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's errors amounted to prejudice.[101] A claim for ineffective assistance of counsel fails unless

---

[95] Rule 61(i)(4); *see also Weedon v. State*, 750 A.2d 521, 527 (Del. 2000).
[96] Rule 61(i)(5); *see also State v. Jackson*, 2008 WL 5048424, at *15 (Del. Super. 2008).
[97] *Younger*, 580 A.2d at 555; *see also State v. MacDonald*, 2007 WL 1378332, at *13 (Del. Super. 2007) ("[A] claim of ineffective assistance of counsel is a constitutional violation that undermines the fundamental legality, reliability, integrity or fairness of a proceeding for purposes of [Rule 61 (i)(5)].").
[98] *State v. Zebroski*, 2013 WL 5786359 (Del. 2013).
[99] *Strickland v. Washington*, 466 U.S. 668 (1984).
[100] 551 A.2d 53, 58 (Del. 1988).
[101] *Strickland*, 466 U.S. at 688.

both prongs of the *Strickland* test are established.[102]

To determine whether counsel's representation fell below an objective standard of reasonableness, "a reviewing court should eliminate the distorting effects of hindsight, reconstruct the circumstances of counsel's challenged conduct, and evaluate the conduct from counsel's perspective at the time."[103] Under *Strickland*, trial counsel's decisions are afforded a strong presumption of reasonableness,[104] and a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[105]

To show prejudicial error under *Strickland*, a defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[106] A "reasonable probability" of a different result requires a defendant to show a "probability sufficient to undermine confidence in the outcome."[107] A "reasonable probability" is not shown when the defendant shows only "that the errors have some conceivable effect on

---

[102] *Id.*
[103] *State v. Flowers*, 150 A.3d 276, 282 (Del. 2015) (citing *Strickland*, 466 U.S. at 687-88) (internal quotation marks omitted).
[104] *Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (internal quotation marks omitted).
[105] *Id.* at 687.
[106] *Id.* at 694.
[107] *Id.* at 693-94.

the outcome of the proceeding."[108] Instead, the defendant must show that counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[109] In assessing prejudice from counsel's errors, the Court in *Strickland* stated:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.
>
> . . . .
>
> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.[110]

The Court must therefore determine whether the defendant has demonstrated that, but for counsel's errors, the decision reached would have been different.[111]

**Procedural Bars to Postconviction Relief**

Before considering any substantive issues, the Court must first determine if Romeo's Second Motion meets the Rule 61(i) procedural requirements.[112]

Romeo argues his claims should be considered under the Rule 61(i)(4) and (5) exceptions.[113] The State argues that Romeo has not availed himself of the

---

[108] *Id.* When trial counsel made strategic choices "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91

[109] *Id.* at 687.

[110] 466 U.S. at 695.

[111] *Id.* at 694.

[112] *See supra* notes 89-90 and accompanying text. Ineffective assistance of counsel claims are not subject to the Rule 61(i)(3) procedural bar because such claims are meant to be raised in the postconviction setting. *See State v Rivera*, 2015 WL 4126946, at *3 n.11 (Del. Super. 2015). Because Romeo's Second Motion exclusively involves claims of ineffective assistance of counsel, none of the claims set forth within this Motion are subject to the procedural default rule of Rule 61(i)(3).

[113] Def.'s Am. Mot. Reply 2.

exception in Rule 61(i)(5) and, therefore, his claims should be denied as procedurally barred under Rules 61(i)(1)-(4).[114] Alternatively, the State argues that Romeo "cannot establish that counsel was ineffective and that he suffered prejudice as a result."[115]

Rule 61(i)(1) provides that a motion for postconviction relief filed more than one year after a final judgment of conviction is barred unless the motion asserts a retroactively applicable right that is newly recognized after the judgment of conviction became final.[116] Where a defendant files a direct appeal, a judgment of conviction becomes final when the Delaware Supreme Court issues a mandate determining the case on direct review.[117] In this case, the Supreme Court issued a mandate affirming the Superior Court's judgment of Romeo's conviction on July 6, 2011.[118] Romeo filed the Second Motion on May 27, 2014.[119] Romeo's Second Motion was filed more than one year after the date final judgement was entered and it is therefore time-barred.

Rule 61(i)(2) bars repetitive motions. A motion is considered repetitive when

---

[114] State's Resp. to Def.'s Suppl. Am. Mot., D.I. 141, at 4, Sept. 27, 2018 [hereinafter "State's Resp. to Def.'s Suppl. Am. Mot."].
[115] *Id.*
[116] Rule 61(i)(1).
[117] *Id.* at (m)(1); *see also State v. Grayson*, 2011 WL 285599, at *3 (Del. Super. 2011) ("A judgment of conviction is final, *inter alia*, when the Supreme Court [of Delaware] issues a mandate or order finally determining the case on direct review.") (internal quotation marks omitted).
[118] D.I. 84.
[119] D.I. 100.

it is based on any ground that could have been, but was not, asserted in a prior postconviction motion.[120] The Delaware Supreme Court has held that under Rule 61 (b)(2) and (i)(2), a defendant must include *all* available grounds pertaining to an ineffective assistance of counsel claim in his or her *first* motion for postconviction relief.[121] "If the first petition is incomplete, then [the] Court will not consider the merits of the second petition unless the appellant can prove either the occurrence of a constitutional violation or that consideration of the claim is warranted in the interests of justice."[122]

As noted above, Romeo previously filed a Motion for Postconviction Relief in this Court – the First Motion.[123] Romeo's First Motion was required to include *all* grounds for relief available to him at the time of filing. The Court denied all of the claims of ineffective assistance of trial and appellate counsel raised in Romeo's

---

[120] *State v. Gattis*, 2005 WL 3276191, at *16 (Del. Super. 2005); *see also State v. Sykes*, 2014 WL 619503 (Del. Super. 2014) ("Superior Court Criminal Rule 61 provides that a defendant convicted of an offense may collaterally attack his conviction following exhaustion of his direct appeal by filing a motion for postconviction relief that shall specify all available grounds for relief.").

[121] *Nicholson v. State*, 1990 WL 168266, at *2 (Del. 1990) ("This Court has clearly and unmistakably ruled that, according to Superior Court Criminal Rules 61(b)(2) and 61(i)(2), a defendant must include all available grounds for relief in his first petition for review of an ineffective assistance of counsel claim."); *see also* Super. Ct. Crim. R. 61(b)(2) ("The motion shall specify all the grounds for relief which are available to the movant and of which the movant has or, by the exercise of reasonable diligence, should have knowledge, and shall set forth in summary form the facts supporting each of the grounds thus specified.").

[122] *Nicholson*, 1990 WL 168266, at *2 (internal quotation marks omitted) (citing *Younger*, 580 A.2d at 555); *see also* Rule 61(i)(2), (5).

[123] Def.'s First Mot.

First Motion.[124]  When he filed the First Motion in March 2012, Romeo either knew or should have known the grounds for the present motion.[125]  Because Romeo raised claims of ineffectiveness of counsel in his First Motion, he "is not free to relitigate that issue further even though he now sets forth new specifications of alleged ineffectiveness."[126]  As a result, Romeo's Second Motion is barred under Rule 61(i)(1) and (2).  To overcome these procedural bars, Romeo must demonstrate that his claims fall within the Rule 61(i)(5) exception.[127]

**Ground One and Ground Two:  Admissibility of Holden and Sheila's 3507 Statements**

### The Introduction of Holden and Sheila's 3507 Statements

With respect to Holden and Sheila's 3507 Statements, Romeo contends that Trial Counsel was ineffective for failing to object for lack of foundation.[128]  Romeo argues that the 3507 Statements were improperly admitted because the State did not question each witness about the truthfulness of their out-of-court statement.[129]  Romeo asserts that Trial Counsel's "failure to attempt to block the admission of such evidence prejudiced Mr. Romeo because the witness' in court testimony was not as strong as Solge's interpretive narratives."[130]

---

[124] 2012 Order ¶ 34.
[125] *Robinson v. State*, 562 A.2d 1184, 1185 (Del. 1989).
[126] *Barr v. State*, 1990 WL 39081, at *2 (Del. 1990).
[127] Romeo has not asserted that the Rule 61(i)(2) "interest of justice" exception is applicable to the instant motion. *See generally* Def.'s Am. Mot. Reply; Def.'s Suppl. Am. Mot. Reply.
[128] Def.'s Am. Mot. 13-15.
[129] *Id.*
[130] *Id.* at 16.

In response, the State relies on *Hoskins v. State*, to argue that "[f]ailure of defense counsel to object to the failure of the State to establish the truthfulness of a section 3507 statement does not constitute a *Strickland* violation."[131] In *Hoskins*, the Delaware Supreme Court held that trial counsel's decision was professionally reasonable where he challenged the credibility of each witness by cross-examining them about their pretrial recorded statements (which he had already carefully reviewed) instead of objecting to the admission of the 3507 Statements for an improper foundation on truthfulness.[132]

The admission of Holden and Sheila's out-of-court statements (from their respective police interviews) is governed by 11 *Del. C.* § 3507.[133] Section 3507 provides, in relevant part:

> (a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

> (b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.[134]

In *Ray v. State*, the Delaware Supreme Court summarized the foundational

---

[131] State's Resp. to Def.'s Am. Mot., D.I. 113, at 15-16, May 17, 2017 [hereinafter "State's Resp. to Def.'s Am. Mot."] (citing *Hoskins v. State*, 102 A.3d 724 (Del. 2014)).
[132] 102 A.3d at 734-35.
[133] 11 *Del. C.* § 3507.
[134] *Id.*

requirements for admitting a statement under Section 3507 as follows:

> In order to offer the out-of-court statement of a witness, the statute requires the direct examination of the declarant by the party offering the statement, as to both the events perceived or heard and the out-of-court statement itself. Thus, *a witness' statement may be introduced only if the two-part foundation is first established: the witness testifies about both the events and whether or not they are true.* Finally, in order to conform to the Sixth Amendment's guarantee of an accused's right to confront witnesses against him, the victim must also be subject to cross-examination on the content of the statement as well as its truthfulness.[135]

Romeo cites to *State v. Flowers*[136] to support his argument that "a Sixth Amendment violation occurs if a § 3507 statement is played for the jury without the proper foundation."[137] Romeo also points to *Blake v. State*,[138] as discussed in *Flowers*. In *Blake*, the Delaware Supreme Court explained that "the foundational

---

[135] 587 A.2d 439, 443 (Del. 1991) (internal citations and quotation marks omitted) (emphasis added).

[136] Romeo cites to the Superior Court Commissioner's Report and Recommendation in *State v. Flowers*, 2015 WL 1881036 (Del. Super. April 23, 2015). *See* Def's Am. Mot. 10. In *Flowers*, the Commissioner found that trial counsel was ineffective by failing to object to the admission of the 3507 Statements based on an inadequate foundation. The State filed Objections to the Commissioner's Report and Recommendation pursuant to Superior Court Criminal Rule 62(a)(5)(ii). The Court subsequently adopted in part and rejected in part the Commissioner's findings, holding:

> The Commissioner's well-reasoned analysis concluded that Trial Counsel's failure to object was objectively unreasonable and resulted in prejudice to Defendant. While the Court agrees that relief should be granted for Defendant's [claim of ineffective assistance for trial counsel's failure to object to the admission of the 3507 Statements], the Court grounds its decision in Defendant's Sixth Amendment right to confront witnesses against him.

*State v. Flowers*, 2015 WL 7890623, at *2-3 (Del. Super. 2015), *rev'd*, 150 A.3d 276 (Del. 2016).

[137] Def's Am. Mot. 10.

[138] *Blake v. State*, 3 A.3d 1077 (Del. 2010).

requirements that the witness indicate whether or not the prior statement is true is one reason why the substantive operation of section 3507 does not violate the Sixth Amendment."[139]

In *State v. Flowers*, Flowers filed a motion for postconviction relief alleging, *inter alia*, that trial counsel was ineffective for failing to object to the admission of five 3507 Statements for lack of foundation.[140] The Superior Court analyzed defendant Flowers' claims of ineffective assistance of counsel in his second motion for postconviction relief under Rule 61(i)(5).[141] The Superior Court found the proper foundation was not established because the State failed to inquire as to the truthfulness of each of the five out-of-court statements.[142] The Superior Court held that Flowers was deprived of his Sixth Amendment right to confront the witnesses because the truthfulness of the 3507 Statements was not established before being admitted.[143] Although the Superior Court determined that trial counsel's decision not to object to the improper foundation for the five 3507 Statements was a reasonable professional judgment, the Court held that the admission of the 3507 Statements constituted a constitutional violation that undermined the fundamental integrity and fairness of the trial.[144] As a result, the Superior Court granted Flowers'

---

[139] *Blake*, 3 A.3d 1077, 1082 (Del. 2010).
[140] *State v. Flowers*, 2015 WL 7890623, at *1 (Del. Super. 2015).
[141] *Id.* at *2.
[142] *Id.* at *3.
[143] *Id.*
[144] *Id.* at *2.

motion and vacated his judgments of conviction.[145]  The State appealed to the

Delaware Supreme Court.[146]  In reversing the judgment of the Superior Court, the

Delaware Supreme Court held that the Rule 61(i)(5) exception was not properly

invoked because:

> Under the circumstances of Flowers' case, trial counsel's failure to object to the absence of a foundational question that would have not prevented the admission of the statements into evidence was objectively reasonable.  Flowers has not demonstrated a reasonable probability that an objection would have changed the outcome of his trial.[147]

The Delaware Supreme Court in *Flowers* discussed trial counsel's discretion

to make professional judgments in deciding whether or not to object to statements

admitted under Section 3705.[148]  Although the State failed to establish a Section

3507 foundation requirement when it failed to ask the witnesses on direct-

examination whether their prior statements were truthful, the Supreme Court noted

that Flowers' trial counsel made a professional judgment not to object to the

admissibility of the statement.[149]  The Supreme Court found that Flowers' trial

counsel's decision to challenge the credibility of each witness by cross-examining

them about their recorded statements, which he had reviewed, was "professionally

---

[145] *Id.* at *4-5.
[146] *State v. Flowers*, 150 A.3d 276, 277 (Del. 2016).
[147] *Id.* at 283.
[148] *Id.*
[149] *Id.* at 281.

reasonable."[150] The Supreme Court explained that "the defense attorney has the immediate and ultimate responsibility of deciding if and *when to object*, which witnesses, if any, to call, and what defenses to develop."[151] In *Flowers*, the Supreme Court ultimately held that trial counsel's decision to not object was professionally reasonable, and that no constitutional violation existed because:

> If trial counsel for a defendant makes a reasonable decision not to make a foundational objection to a witness statement under Section 3507, the failure cannot then be considered a violation of the defendant's right to confrontation, much less when the defendant's counsel vigorously confronted the witness on cross-examination on all material issues covered by that statement.[152]

In *Redden v. State*, decided a week after *Flowers*, the Delaware Supreme Court addressed ineffective assistance of counsel claims under Rule 61(i)(5), where the defendant claimed that his trial counsel failed to object to the admission of 3507 Statements.[153] During Redden's trial, the State did not ask either witness about the truthfulness of their prior out-of-court statements.[154] The 3507 Statements were admitted without objection.[155] The Delaware Supreme Court held that there was

---

[150] *Id.*

[151] *Id.* (quoting *Cooke v. State*, 977 A.2d 803, 840-41 (Del. 2009)). The Supreme Court also held that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 596 (1993)).

[152] *Flowers*, 150 A.3d at 283.

[153] 150 A.3d 768, 774 (Del. 2016).

[154] *Id.*

[155] *Id.* at 775. In his affidavit in response, Redden's trial counsel explained that he felt there was nothing to gain by objecting to the introduction of the statements. *See id.* at 774.

"no basis on this record to doubt that Redden's trial counsel's failure to object was 'within the wide range of reasonable professional assistance.'"[156] Moreover, the Court held that trial counsel's failure to object to the introduction of the 3507 Statements did not satisfy the Rule 61(i)(5) "miscarriage of justice" exception because 3507 Statements are "admissible irrespective of the witness's response to the prosecutor's foundational questions."[157] Most significantly, the Court in *Redden* noted the "distinction between defense counsel's right to insist that the State establish the truthfulness of the statement and defense counsel's right to 'make a professional judgment not to object' if the State fails to do so."[158] The Court in *Redden* held that Redden failed to demonstrate a reasonable probability that an objection to the 3507 Statements would have changed the outcome of his trial because "the statements would have been admissible regardless of whether the witnesses denied or affirmed their truthfulness."[159]

In the instant case, Romeo's Trial Counsel filed affidavits in response to the ineffective assistance claims in both of Romeo's postconviction motions.[160] In his January 17, 2017 sworn affidavit, Trial Counsel averred the following:

---

[156] *Id.* at 774 (quoting *Strickland*, 466 U.S. at 689).
[157] *Redden*, 150 A.3d at 774.
[158] *Id.* (citing *State v. Flowers*, 150 A.3d 267 (Del. 2016)).
[159] *Id.* at 775.
[160] Trial Counsel's Aff., D.I. 91, May 3, 2012 [hereinafter "Trial Counsel 2012 Aff."]; Trial Counsel's Aff., D.I. 111, Jan. 17, 2017 [hereinafter "Trial Counsel 2017 Aff."]; Trial Counsel's Suppl. Aff., D.I. 127, Mar. 16, 2018 [hereinafter "Trial Counsel March 2018 Aff."]; Trial Counsel's Suppl. Aff., D.I. 140, Sept. 21, 2018 [hereinafter "Trial Counsel Sept. 2018 Aff."].

44

Had I objected to the admission of the statement based upon the State's failure to ask the truthfulness question, the State simply would have asked the witnesses the missing question. . . . [T]he State then would have been permitted to proceed, regardless of the answer from the witness. . . . Whether or not the State asked [Sheila and Holden] if their statements had been truthful, was not, in my opinion, something that would have made a difference.[161]

This Court will not disturb the strong presumption that Trial Counsel's conduct falls within the wide range of reasonable professional assistance.[162] If Trial Counsel had objected to the introduction of Sheila's 3507 Statement, as Romeo claims he should have done, Sheila would have probably affirmed that her prior statements were still truthful, both because she took an oath to tell the truth before she testified at trial, and because her trial testimony was consistent with her prior statement.[163] Further, once Holden testified on cross-examination about the truthfulness of his statement, Trial Counsel reasonably concluded that the Section 3507 violation was technical and not substantive.[164] "The Delaware Supreme Court has held that such technical violations do not overcome the presumption of

---

[161] Trial Counsel 2017 Aff. ¶¶ 2-3.

[162] *Strickland*, 466 U.S. 668, 688 (1984).

[163] *See Hoskins v. State*, 102 A.3d 724, 735 (Del. 2014) ("[A]bsent any prejudice to the defendant, we will not reverse as an abuse of discretion a trial court's decision to admit evidence based upon the technical requirements of § 3507."); *see also Woodlin v. State*, 3 A.3d 1084, 1089 (Del. 2010) (finding truthfulness implicitly affirmed where the testimony of a witness was consistent with her prior recorded statements).

[164] *See State v. Rivera*, 2015 WL 4126946, at *3 (Del. Super. 2015) (finding that it was reasonable for trial counsel to conclude that the Section 3507 violation was more technical in nature where the witness testified about the events and the truthfulness of the statement established during cross-examination).

professional reasonableness."[165]

The Court finds that Trial Counsel's failure to object to the introduction of Holden and Sheila's 3507 Statements based on improper foundation does not satisfy the first prong of *Strickland*. The Court further finds that these claims do not satisfy the Rule 61(i)(5) exception.[166]

**Detective Solge's Testimony on Holden and Sheila's 3507 Statements**

Romeo argues that Trial Counsel was ineffective for failing to object to Det. Solge's "interpretative narrative" of Holden and Sheila's statements to police.[167] The State argues that to characterize Det. Solge's Section 3507 testimony as an "interpretive narrative" is inaccurate because, "[o]n direct examination, the State asked Det. Solge pointed, specific questions and he provided terse, direct answers."[168] The State further argues that Trial Counsel "appropriately concluded questioning Det. Solge was a more effective approach than insisting on playing the recorded statements."[169]

---

[165] *Id.*; *see also Jackson v. State*, 643 A.2d 1360, 1368-69 (Del. 1994) ("While there may have been a technical non-compliance with the requirements for the admission of prior statements pursuant to section 3507, it was clearly one of form rather than substance.").

[166] *See Redden*, 150 A.3d 768, 774 (Del. 2016) (finding the Rule 61(i)(5) "miscarriage of justice" exception not satisfied where trial counsel failed to object to the introduction of two 3507 Statements).

[167] *See* Def.'s Am. Mot. 11-17; Def.'s Am. Mot. Reply 3-6 ("By allowing Solge's interpretive narrative, the jury was given the witnesses greatest hits version of their statements, rather than what was actually said.").

[168] State's Suppl. Br. in Resp. to Def.'s Am. Mot. Reply, D.I. 117, at 11, Oct. 25, 2017 [hereinafter "State's Suppl. Br."].

[169] *Id.* at 11-12.

Romeo cites to *Huggins v. State*[170] to support his "interpretive narrative" argument.[171] In 1975, the Delaware Supreme Court, with respect to an earlier version of Section 3507, held:

> It is the statement of the declarant that is being admitted, not the interpretative narrative of the person who heard the statement. Care should be taken to guarantee that the Statute is not abused by permitting a witness, such as a police officer, to embellish the prior statement by his own interpretation, even if the embellishment is made in the utmost good faith.[172]

In response to the alleged failure to object to Det. Solge's "interpretive narrative" of Holden and Sheila's statements to police, Trial Counsel averred the following in his sworn affidavit:

> I was satisfied with cross-examining the witnesses without playing their recorded statements. I believed that playing the statements would have done more harm than good as the statements contained much damaging material. I believed that questioning Det. Solge and the witnesses was a more effective approach than insisting on the playing of the statements themselves. I further believed that if Det. Solge were to stray from the statement, I could then successfully point this out to the jury and potentially argue that he was taking liberties in an effort to make the State's case better.[173]

---

[170] 337 A.2d 28 (Del. 1975); *see State v. Scott*, 1989 WL 90613 (Del. Super. 1989) ("In [Huggins] the Supreme Court was critical of testimony offered by police officers as to the substance of statements made by a codefendant of Huggins while the codefendant was in custody. The Supreme Court was concerned that the officer's paraphrase of the codefendant's statement might be colored by bias and that the police officers had the capacity to reduce such statements to writing or to take careful notes of precisely what was said in oral statements.").

[171] Def.'s Am. Mot. 9.

[172] *Huggins*, 337 A.2d at 29 (emphasis added). The Court in *Huggins* reviewed 11 *Del. C.* § 3509, which now appears in the 1974 Revision of the Delaware Code Annotated as 11 *Del. C.* § 3507. *Id.*

[173] Trial Counsel 2017 Aff. ¶ 4.

### Detective Solge's Testimony on Holden's 3507 Statement

Romeo argues that "without objection from trial counsel, Detective Solge inappropriately provided his own interpretive narrative that Holden told him he saw gunfire coming from the shooter's hand."[174] To support his argument, Romeo points to Det. Solge's testimony that Holden "didn't actually see the weapon itself, as he – Mr. Holden testified before[,] he did not have his glasses on, but he did see fire coming from [the shooter's] hand."[175] Romeo also points to Det. Solge's "interpretive narrative" on cross-examination when Trial Counsel asked: "But even though he had taken the glasses off, he told you that he was able to recognize certain people?" In response, Det. Solge testified: "Correct. He could still see somewhat."[176] The Court presumes Det. Solge extracted this information from the following portion of Holden's police interview:

> Q: [D]id you know it was a gun in his hand?
> A: *I didn't even see the gun* it was dark.
> Q: Okay but you saw some kind of object in his hand?
> A: I didn't even see the object. What made me know that it was a gun because *I heard the shot and I seen [sic] the spark.*
> Q: Okay . . . the spark came from one of his hands?
> A: Yeah it seem [sic] like it was like *right in front of his hand.*
> Q: Okay.
> A: Like hands on and then cause [sic] it was dark and like he putting it down I seen [sic] his arm and then it was dark but I seen [sic] like the spark come right from in front of his -
>
> . . . .
>
> A: I didn't really get to see like his facial features cause [sic] by the

---

[174] Def.'s Suppl. Am. Mot. 11.
[175] Def.'s Am. Mot. 13-14.
[176] *Id.*

48

time when we had start fighting *I wear glasses* as you can see *I had took [sic] my glasses off just* in case fists would start flying towards my face I didn't want my glasses to get broken.

Q: Okay.

A: So like I can like I seen some facial features but not like -

Q: You bring up a good point I don't mean to stop you but you bring up a good point . . . about your glasses, you had taken them off?

A: Right.

Q: Can you describe what kind of prescription that you have I mean are you like farsighted?

A: *I can't see far away.*

Q: Okay but if you took your glasses off now.

A: Right.

Q: Say I walk thirty feet on the other side of your house.

A: Right.

Q: Okay would you be able to see me?

A: *I would be able to see that you're white and that I can probably see like that you have on blue jeans and brown shoes and probably that shirt. I couldn't tell your facial features or nothing.*[177]

Romeo argues that Det. Solge offered an "interpretive narrative" when he "told the jury that Holden also stated the first gunshot struck the ground, and the second shot was towards Antoine."[178] Romeo points to the following portion of Det. Solge's testimony:

Q: [D]id Mr. Holden tell you how many of these fires that he saw coming from the gun that he saw?

A: Approximately four shots fired.

Q: Okay, and did Mr. Holden tell you whether or not he saw the direction of the first gunshot fired?

A: He stated the first shot struck to the ground or was towards the ground.

Q: Did he tell you the direction of the second shot that he saw?

---

[177] Tr. Holden Interview A359-60, A363 (emphasis added).

[178] Def's Am. Mot. 13.

A: Yes, towards [Antoine].[179]

Holden's statement to police, in relevant part, was as follows:

> The next thing you know before I can get back across the street [the shooter] had just pushed off and just started shooting and when he started shooting I turned and *I only seen [sic] one shot* and I seen [sic] the sparks and then I turned around and just ran . . . .[180]

From this it is clear that Det. Solge's testimony misstated Holden's statement in regard to the direction of the second shot. Due to this misstatement, the Court must analyze whether Trial Counsel's failure to object to this discrepancy caused his representation to fall below an objective standard of reasonableness. For the reasons discussed below, the Court finds it did not. In light of all the circumstances, the Court finds that Trial Counsel's professional judgment to avoid having the audio-recording of Holden's interview played at trial fell within the wide range of professionally competent assistance.[181]

In his affidavit, Trial Counsel expressed concern over the prejudice that would occur if the State introduced the recorded interviews of the witnesses.[182] The State decided to have Det. Solge testify under Section 3507 instead of introducing the recorded interviews to be played at trial. If Trial Counsel had objected to Det. Solge's testimony about Holden's statement to police, it is likely the State would

---

[179] 11/04/09 Trial Tr. 126.
[180] Tr. Holden Interview A345.
[181] *See Strickland,* 466 U.S. at 690.
[182] *See supra* note 160.

50

have introduced the audio-recording of Holden's police interview. If that recording had been played, the jury would have heard statements consistent with Holden's trial testimony and a detailed account of the shooter's actions that night – much of which corroborated the accounts of Sheila, King, and Ray.

Further, the Court finds that Trial Counsel's representation did not fall below an objective standard of reasonableness because he strategically cross-examined Holden to highlight relevant inconsistencies between his police interview statement and Det. Solge's testimony. During cross-examination of Holden, Trial Counsel elicited testimony which reiterated to the jury that, at the time of the shooting, Holden was not facing the direction of the gunfire and therefore did not see any of the shots.[183] In his closing argument, Trial Counsel emphasized Holden's testimony

---

[183] Trial Counsel's strategy to show inconsistencies is demonstrated by the following portion of Holden's cross-examination:

> Q: [W]hich way were you facing when you heard the shots?
> A: I was still facing towards my house.
> Q: Towards your house?
> A: Yes.
> Q: So, you . . . didn't see the shots?
> A: To my knowledge, today, no.
> Q: Well, when you say to your knowledge today, to the best of your recollection, you didn't see the shots?
> A: Yeah, me knowing today.
> Q: And back when you talked with Detective Solge . . . on June 3rd, 2007, you said that you had seen either muzzle fire or flashes; you also said you didn't see the shooter, right?
> A: Yes.

11/04/09 Trial Tr. 151-52.

that he had his back turned and did not see the shooting. In doing so, Trial Counsel highlighted the errors in the State's conclusion that all of the witnesses testified Romeo shot Antoine.[184] In sum, the Court finds insufficient grounds in the record to overcome the presumption of Trial Counsel's reasonableness.

The Court also finds that Romeo fails to satisfy the second prong of *Strickland.* Romeo has not demonstrated that the decision reached would reasonably likely have been different absent Trial Counsel's failure to object to the misstatement.[185] In view of the totality of the evidence before the jury, there is a strong likelihood that the outcome of the proceeding would have remained the same. The jury heard King and Ray's testimony that Romeo's arm was pointed at Antoine

---

[184] In the State's closing argument, the Prosecutor stated that "the one clear theme through this case and what you've heard from every single eyewitness . . . [is] that it was this man who pulled out a gun and pulled the trigger not once, not twice, not three times, but four times, striking and killing Antoine Mayo." Trial Tr., D.I. 77, at 92, Nov. 9, 2009. Trial Counsel, during his closing argument, stated the following:

> [The Prosecutor] said that there are slight inconsistencies with respect to the State's witnesses, slight inconsistencies. And that's to be expected and just focus on the one consistency that they all said Mr. Romeo shot Antoine Mayo. Well, first, let's go back. Fred Holden didn't say that. Fred Holden said, "I don't know who shot. I don't know what happened. I had my back turned. Then I turned over. And I didn't see Ray and something happened. Then I ran." So that's not everybody. So he's not included in that bunch.
> So we have Ray Mayo, [Antoine's] cousin, and Naimah King. Slight inconsistencies. They don't match up in any way except for a shot in the ground, shots up, Mr. Romeo was the shooter.

*Id.* at 107-08.

[185] *See Strickland*, 466 U.S. at 696.

when he fired the second shot.[186] Further, before the jury was presented with the

testimony of Det. Solge, Holden testified as follows:

> Q: [W]ere you facing the direction of the gunshots?
> A: No. I got like halfway turned around . . .
>
> . . . .
>
> Q: [W]ere you able to tell the direction that the gunshots were coming from?
> A: No. They was [sic] behind me, because I didn't see nothing in front of me.
>
> . . . .
>
> Q: Did you ever see a gun before you heard the shots?
> A: No.
> Q: Okay. Did you see who was shooting?
> A: No.
>
> . . . .
>
> Q: Did you see Antoine Mayo at any point when the gunshots rang out?
> A: No.[187]

When Det. Solge testified, the jury was aware of the inconsistency. After

hearing each witness testify, the jury was able to consider and evaluate the witness's

credibility, as well as determine the weight – if any – to be accorded to the proffered

evidence.[188] In view of this, the Court does not find a reasonable probability that

the results of the proceeding would have been different had Trial Counsel objected

to this testimony.

---

[186] *See supra* note 21 and accompanying text (King's trial testimony); *see also supra* note 43 and accompanying text (Ray's trial testimony).
[187] 11/04/09 Trial Tr. 118.
[188] *See Poon v. State*, 880 A.2d 236, 238 (Del. 2005) ("[I]t is the sole province of the fact finder to determine witness credibility, resolve conflicts in testimony and draw any inferences from the proven facts.").

53

### Detective Solge's Testimony on Sheila's 3507 Statement

Romeo argues that Det. Solge's testimony improperly offered an "interpretive narrative" of Sheila's statement. First, Romeo points to Det. Solge's testimony that she saw the person firing the gun.[189] Romeo cites to the following portion of Det. Solge's testimony:

> Q: [D]id [Sheila] tell you whether or not she saw the . . . person firing the gun?
> A: She did.[190]

The video-recorded interview with police shows that Sheila told Det. Solge about the events leading up the shooting, including seeing Romeo get up off of the ground, pull out his gun, and fire the first shot at the ground.[191] It is equally important that, during her interview with police taken the same night as the shooting, Sheila was able to immediately identify Romeo out of a six-person photographic lineup.[192] Det. Solge's testimony appropriately reflected Sheila's statement that she saw the person firing the gun.

Second, Romeo points to Det. Solge's testimony about Sheila's statement that when the second shot was fired at Antoine, Antoine was standing upright in the street and fell after the second shot.[193] Romeo cites to the following portion of

---

[189] Def's Am. Mot. 16.
[190] 11/04/09 Trial Tr. 200.
[191] Sheila told Det. Solge the following: "[Romeo], he got up off the ground and pulled out his little gun. He shot at the ground first . . . ." Tr. Sheila Interview A383
[192] Tr. Sheila Interview A385.
[193] Def's Am. Mot. 16.

Det. Solge's testimony:

> Q: Detective, when [Sheila] told you that the second shot was pointed directly at Antoine Mayo, did she tell you what Antoine Mayo's position was at the time?
> A: Standing upright in the street.
> Q: Did she tell you that she saw [Antoine] fall?
> A: Yes, she did.
> Q: [D]id she tell you after which shot she saw [Antoine] fall?
> A: The second shot, I believe.[194]

During her interview with police, Sheila told Det. Solge that Romeo "shot at the ground at first and then . . . [h]e shot again," and explained that, "[w]hen [Romeo] shot that same time my cousin just hit the ground . . . ."[195] From this, it is plain that Det. Solge accurately conveyed Sheila's statement that Antoine fell after Romeo fired the second shot.

Third, Romeo points to Det. Solge's testimony that Sheila saw the second shot being fired directly at Antoine, as well as subsequent shots.[196] Romeo cites to the portion of Det. Solge's testimony, which provides:

> Q: And did she tell you whether or not she saw the second shot fired?
> A: She did.
> Q: And did she tell you how she saw the second shot being fired?
> A: She was directly looking at the shooter at the time he discharged the round.
> Q: And did she tell you what the shooter's arm position was –
> A: Yes.
> Q: -- when he discharged the second round?
> A: Yes.

---

[194] 11/04/09 Trial Tr. 201-02.
[195] Tr. Sheila Interview A383.
[196] Def's Am. Mot. 16.

Q: And what did she tell you?
A: Directly at [Antoine].
Q: Did she tell you whether or not she saw subsequent shots fired?
A: Yes.
Q: [D]id [Sheila] tell you whether or not she saw the arm position of the shooter when the subsequent shots –
A: Yes, again [Antoine].[197]

Here, Romeo correctly identifies a misstatement in Det. Solge's testimony. Thus, the Court must review Trial Counsel's failure to object to this misstatement under *Strickland.* The Court finds that Trial Counsel's professional judgment not to object was within the wide range of reasonable professional assistance. It is apparent from Trial Counsel's affidavit that his decision not to object was a strategic one because of the "damaging material" contained within Sheila's video-recorded interview. Like with the testimony of Holden's 3507 Statements, Trial Counsel made a tactical decision to cross-examine the witnesses on any discrepancies in Det. Solge's testimony because he believed that "playing the statement[] would have done more harm than good." The Court agrees with Trial Counsel, particularly because had Trial Counsel objected to any misstatements, the State in all likelihood would have played the entire video-recording of Sheila's police interview for the jury. If presented with the video-recording, the jury would have learned that Romeo fired *at least twice more* after he fired the first shot toward the ground, and from

197 11/04/09 Trial Tr. 200-01.

56

these subsequent shots, blood "poured out" of the victim's mouth.[198]

### Interpretive Narrative

Romeo cites to *Morgan v. State*[199] in support of his claim that Det. Solge's testimony was an interpretive narrative of Holden and Sheila's 3507 Statements.[200] In *Morgan*, the Delaware Supreme Court reversed a conviction and held that the trial court erred when it permitted the State to introduce a detective's *unrecorded* conversation with a witness under Section 3507.[201] Unlike the witness's 3507 Statement in *Morgan*, both Holden and Sheila's statements were recorded and made available to Trial Counsel prior to the start of Romeo's trial.[202] Rather than have the recorded statements played to the jury, Romeo's Trial Counsel decided to vigorously cross-examine each witness in court.[203] Trial Counsel consciously and deliberately made that decision to avoid prejudice to Romeo.

After reviewing Det. Solge's testimony and the transcripts of Holden and Sheila's interviews with police, the Court concludes that Det. Solge's recitation of Holden and Sheila's 3507 Statements did not constitute an impermissible

---

[198] *See supra* note 23 and accompanying text.
[199] 922 A.2d 395 (Del. 2007).
[200] Def.'s Am. Mot. 9.
[201] *Morgan,* 922 A.2d at 399.
[202] *See* Trial Counsel 2017 Aff. ¶ 3 ("In advance of trial, I had obtained transcripts of the witness' statements to police and their testimony from the first trial."); Def.'s Reply 12 ("Trial counsel admitted he obtained the recordings of the out of court statements of Holden, Sheila Mayo, and Naimah King prior to trial and provided them to a transcriptionist.").
[203] Trial Counsel 2017 Aff. ¶ 4.

"interpretive narrative."[204] Det. Solge's testimony, with the exception of the aforementioned misstatements, effectively mirrored the statement each witness gave in their respective police interviews.[205]

Even assuming, *arguendo*, Trial Counsel erred by not objecting to Det. Solge's testimony of the 3507 Statements, Romeo has not shown that Trial Counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[206] The Court in *Strickland* declared that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."[207] This Court finds that the overwhelming evidence made available to the jury in Romeo's trial supported a finding of First Degree Murder. Moreover, Trial Counsel's affidavits make clear that he believed playing the statements would have done more harm than good because the statements contained "much damaging testimony."[208] The Court agrees with Trial Counsel's assessment that playing the recorded statements would have prejudiced the defense.[209]

---

[204] *Collins v. State*, 2016 WL 2585782, at *5 (Del. 2016) ("The law requires that the detective accurately represent the witness's actual statement and not give a personal interpretation of the statement.").

[205] The Delaware Supreme Court has never required that the State present a verbatim recording of the declarant's statement. *See id.* at *4.

[206] *Strickland*, 466 U.S. at 687.

[207] *Id.* at 696.

[208] Trial Counsel 2012 Aff. ¶ 14.

[209] Trial Counsel 2017 Aff. ¶ 4. In fact, the trial judge is certain of it.

Romeo fails to satisfy either prong of *Strickland*: he has not demonstrated that Trial Counsel's conduct was outside the "wide range of reasonable professional assistance," nor has he demonstrated "a probability sufficient to undermine confidence in the outcome of the trial."[210] As previously discussed, the Court finds Trial Counsel made a reasonable decision to not object to the introduction of Holden and Sheila's 3507 Statements despite the absence of a proper foundation as to the truthfulness of the statements.[211] Further, for the reasons stated above, the Court finds it was professionally reasonable for Trial Counsel to vigorously cross-examine the witnesses instead of objecting to Det. Solge's testimony of the 3507 Statements. Romeo cannot demonstrate a reasonable probability that, but for Trial Counsel's failure to object, the result of the proceedings would have been different.

The Court finds that these claims do not demonstrate "a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction." Thus, the exception of Rule 61(i)(5) similarly does not warrant relief. Consequently, **Ground One and Ground Two of Romeo's Second Motion are DENIED.**

---

[210] *Strickland*, 466 U.S. 668, 688 (1984).
[211] *See supra* pp. 44-46.

**Ground Three: Cross-Examination of King**

Romeo argues that Trial Counsel should have cross-examined King on the inconsistencies between her trial testimony and her statements to police.[212] Romeo points to King's statement that Romeo "shot at the ground," and King's trial testimony that Romeo "raised his arm straight out and shot at Antoine before he fell to the ground."[213] Romeo contends that the inconsistency of King's testimony should have been exposed to the jury during trial, and that "[t]rial counsel's failure to cross examine King on this issue, which went to the state of mind for the crimes charged, was clearly ineffective."[214]

In response, the State argues that "[i]t cannot be ineffective for trial counsel to avoid asking a question about the angle of a shot when that issue is not part of the police report."[215] The State argues that "[f]urther cross-examination on this point would not have assisted Romeo," because "King told the detective that Romeo shot four times, and one of the shots was at the victim while he was on the ground."[216] The State also argues that this claim does not satisfy the Rule 61(i)(5) "miscarriage of justice" exception because King's statements "identify Romeo as directly shooting Antoine Mayo," and "cross-examining King on minor

---

[212] Def.'s Am. Mot. 17-19.
[213] Def.'s Am. Mot. 18; *see* Tr. King Interview A400-02; *see also* 11/05/09 Trial Tr. 32-33.
[214] Def.'s Am. Mot. Reply 6-7.
[215] State's Resp. to Def.'s Am. Mot. 19.
[216] *Id.*

inconsistencies would have only highlighted her unwavering identification."[217]

An initial review of Ground Three reveals that the Court has addressed this claim once before. In his First Motion, Romeo claimed that he received ineffective assistance of counsel because Trial Counsel "failed to confront states [sic] witness's [sic] with their actual out of court statements for the purpose of impeachment . . . ."[218] In denying this claim, the Court held:

> The Court is satisfied that *Counsel was effective*, however, looking to the totality of the evidence provided to the jury, the Court believes that *no prejudice to Defendant resulted from Counsel's alleged ineffective actions*. Counsel effectively cross-examined the detective and the shooting witnesses and provided sufficient information to the jury which enable them to consider the inconsistencies and the misstatements.[219]

Rule 61(i)(4) bars a defendant's claim for relief that was formerly adjudicated in a prior postconviction proceeding. Merely refining or restating a claim does not entitle a defendant to have a court reexamine an issue that has been previously adjudicated.[220] Because the Court previously adjudicated this claim in its Order on Romeo's First Motion, it is barred under Rule 61(i)(4).

Even assuming *arguendo* this claim was not previously adjudicated, Romeo fails to demonstrate that King's testimony was, in fact, inconsistent. King's

---

[217] State's Suppl. Br. 12.
[218] Def.'s First Mot.
[219] 2012 Order ¶ 27 (emphasis added).
[220] *See Duhadaway v. State*, 2005 WL 1469365 (Del. 2005) (internal quotation marks omitted) (denying a defendant's second motion for postconviction relief under Rule 61(i)(4)).

interview statement was that Romeo shot at the ground and shot at Antoine, and her trial testimony was that Romeo raised his arm and shot at Antoine.[221] King's statement to police and her trial testimony are consistent.[222] Therefore, **Ground Three is barred as previously adjudicated.[223]**

**Ground Four: Ricochet Theory**

Romeo argues that Trial Counsel was ineffective for failing to present the Ricochet Theory to undermine the State's theory of an intentional killing.[224] Romeo argues that Trial Counsel's trial strategy should have included evidence and argument that "the bullet which may have caused fatal injury was shot into the ground and ricocheted into the victim ("the ricochet theory") – thus making it a reckless killing."[225] Romeo also argues that Trial Counsel was ineffective for failing to challenge the State's theory of an intentional killing by utilizing the out-of-court statements of King, Sheila, Ray and Holden to support a finding of a

---

[221] *See supra* pp. 6-8.

[222] The recorded video of King's police interview shows her indicating the angle of Romeo's arm while she told Det. Solge: "[Romeo] shot three rounds. Two at the ground and then he shot again but Antoine was on the ground . . . and then that's when [Antoine] like completely dropped." *See* Tr. King Interview A400-01.

[223] The Court finds that the Rule 61(i)(4) exception does not warrant reconsideration of this claim. *See Cabrera v. State*, 173 A.3d 1012, 1025 (Del. 2017) ("When applying the interests of justice exception, our Court has recognized two exceptions to law of the case—'when the previous ruling was clearly in error or there has been an important change in circumstances, in particular, the factual basis for issues previously posed . . .[and] [s]econd, the equitable concern of preventing injustice.'" (quoting *Weedon v. State*, 750 A2d 521, 527-28 (Del. 2000))).

[224] *See* Def.'s Suppl. Am. Mot. 2-4; *see also* Def.'s Suppl. Am. Mot. Reply 7-11.

[225] Def.'s Suppl. Am. Mot. 2.

reckless killing.[226]

In response, the State argues that Ground Four is barred by the former adjudication bar of Rule 61(i)(4) because in Romeo's First Motion, he argued trial counsel was ineffective for failing to raise an adequate defense to negate the requisite intent necessary to prove First Degree Murder.[227] The State alternatively argues that even if the Court were to reach the merits of this claim, Romeo cannot establish that counsel was ineffective and that he suffered prejudice as a result.[228] In support of this argument, the State asserts that "[a]rguing that Manslaughter was an alternative verdict was inconsistent with trial counsel's theory of the case and trial strategy."[229] The State further argues that the Ricochet Theory would have been entirely contrary to Romeo's statements from his video-recorded interview with police, which was played for the jury at trial.[230]

The Court agrees with the State's argument. Although Romeo contends that Ground Four was not previously adjudicated, the record belies this contention.[231]

---

[226] *See* Def.'s Suppl. Am. Mot. 4-9; *see also* Def.'s Suppl. Am. Mot. Reply 9-10.

[227] *See* State's Resp. to Def.'s Suppl. Am. Mot. 3.

[228] *Id.* at 4.

[229] *Id.*

[230] *Id.* at 9-10.

[231] Romeo contends that the Rule 61(i)(4) procedural bar is inapplicable to the Second Motion's claims for the following reasons:

> In his pro se Motion filed in 2012, Mr. Romeo asserted a broad claim that "counsel err in not putting up an adequate defense on the state theory of intent thus violating the 6th Amendment Right." . . . At no point, however, did the Court address the specific issue of trial counsel's choice to abandon a viable and previously successful defense that the bullet that struck the victim and killed him ricocheted

As discussed in Ground Three, Rule 61(i)(4) bars any claim for relief that was formerly adjudicated in a prior postconviction proceeding.[232] Romeo's First Motion set forth a claim of ineffective assistance of Trial Counsel for "not putting up a [sic] adequate defense on the state theory of intent" and for Trial Counsel's failure to "confront states [sic] witness's [sic] with their actual out of court statements for the purpose of impeachment and discrediting the state [sic] theory of intent."[233] The Court rejected this argument in its November 19, 2012 Order, holding that Trial Counsel made a strategic decision to impeach and discredit the State's theory of intent by relying on the transcripts of the out-of-court statements when cross-examining the State's witnesses instead of playing their recorded statements to the jury.[234] The Court held that Trial Counsel made a tactical decision to argue that the wrong person was on trial, and noted that even if Trial Counsel had focused "on the intent of the shooter, the jury may focus on Defendant as the shooter rather than consider another potential shooter."[235] Further, as the Court noted:

> Taking a stand that [Romeo] was not the shooter is inconsistent with a defense that [Romeo] did not intend to shoot the victim. Cross-examining a witness with evidence which might bolster the State's position would open up Counsel to an ineffective assistance of counsel

off of the ground. The Court also did not address trial counsel's failure to use the out of court statements of the State's witnesses to advance the ricochet theory.

Def.'s Suppl. Am. Mot. Reply 4-5.
[232] Rule 61(i)(4).
[233] Def.'s First Mot.
[234] 2012 Order ¶¶ 18, 20.
[235] *Id.* at ¶ 19.

claim, as well as place his client in peril.[236]

The Court did not find Trial Counsel's representation to be ineffective, and determined that Romeo did not suffer prejudice from Trial Counsel's strategic decision "to preserve Defendant's right to be presumed innocent of the charges by eschewing a protracted discussion of intent."[237]

Romeo's hindsight wish for an alternative trial strategy does not entitle him to a second bite at the apple.[238] The mere availability of an alternative trial strategy does not mean that Trial Counsel's performance was unreasonable or that Romeo did not receive a fair trial.[239] Thus, **Ground Four of Romeo's Second Motion is barred by Rule 61(i)(4) as formerly adjudicated.**

### Rule 61(i)(4) Interest of Justice Exception

Pursuant to Rule 61(i)(4), to relitigate this formerly adjudicated claim, Romeo must demonstrate that reconsideration is warranted in the "interest of justice." There are two situations recognized by the Delaware Supreme Court that fall within the scope of the "interest of justice" exception: (1) "when the previous ruling was clearly in error or there has been an important change in circumstances, in particular, the factual basis for issues previously posed;" and (2) where there is

---

[236] *Id.* at ¶ 27.
[237] *Id.*
[238] *See State v. Dickinson*, 2012 WL 3573943, at *8 (Del. Super. 2012).
[239] *Id.*

an "equitable concern of preventing injustice."[240]

Romeo argues that even if the Court finds that the claims in his Second Motion were previously adjudicated, "both situations exist permitting this Court to reconsider [his] claims in the interest of justice."[241] Romeo asserts there has been an important factual change in the circumstances of this case regarding the credibility of the State's ballistics expert, Carl Rone ("Rone").[242] Romeo further asserts that the equitable concern of preventing injustice permits this Court to consider the merits of his claim because he was not appointed counsel for his First Motion and therefore was forced to "forge his way through the postconviction process alone."[243]

### *Important Factual Change in Circumstances*

At Romeo's trial, the State called Rone to testify about the bullet recovered from the victim's body, and the four cartridge cases recovered from the scene on the night of the shooting.[244] Rone testified that the bullet recovered from the victim was not consistent with being shot into the ground.[245] While the proceedings for Romeo's Second Motion were pending, Rone was arrested for Theft by False

---

[240] *Weedon v. State*, 750 A.2d 521, 527-28 (Del. 2000).
[241] Def.'s Suppl. Am. Mot. Reply 5.
[242] *Id.* at 5-6.
[243] *Id.* at 6.
[244] 11/06/09 Trial Tr. 68, 72-76.
[245] *Id.* at 74-76.

Pretenses and Falsifying Business Records.[246] An investigation found that Rone had received compensation for work that was not performed for approximately 79 days in 2016 and 2017.[247] Romeo argues that this qualifies as a significant change in the factual circumstances of his case because the indictment casts doubt on Rone's credibility.[248] Romeo argues that Rone's credibility is significant because he "was the only witness who countered the ricochet theory whereas most, if not all, of the State's witnesses supported it."[249] In sum, Romeo argues that the combination of Rone's unreliable testimony and Trial Counsel's failure to cross-examine the State's witnesses with their out-of-court statements entitles him to a new trial.[250]

Romeo argues that because "this is the exact issue" recognized by the Delaware Supreme Court in *Fowler v. State*, Ground Four satisfies the Rule 61(i)(4) interest of justice exception.[251] This is not as Romeo contends, the exact issue addressed in *Fowler*.

In *Fowler*, the Delaware Supreme Court reversed the Superior Court's judgment denying Fowler's motion for postconviction relief and remanded for a

---

[246] *See Former DSP Civilian Employee Arrested*, DELAWARE STATE POLICE NEWSROOM (May 8, 2018), https://dsp.delaware.gov/2018/05/08/former-dsp-civilian-employee-arrested.
[247] *Id.*
[248] Def.'s Suppl. Am. Mot. Reply 6.
[249] *Id.*
[250] *See* Def.'s Suppl. Am. Mot. Reply 11, 15.
[251] 194 A.3d 16 (Del. 2018); *see* Def.'s Suppl. Am. Mot. Reply 13-15.

new trial.[252] The Court held the *Jencks*[253] violations were not harmless error when combined with the credibility issue of the State's expert witness.[254] Fowler was convicted of Attempted Murder First Degree and other associated offenses related to two separate shootings.[255] Fowler's conviction was based on the testimony of the only eyewitness to both shootings and Rone's expert testimony. In *Fowler*, Rone presented ballistic evidence that the same gun was used in both shootings which supported the State's theory that Fowler was the shooter in both incidents.[256] Fowler's conviction was based on two "strains" of "key evidence:" (1) eyewitness testimony that was the shooter for both shootings; and (2) ballistic evidence connecting one gun to both shootings.[257] When Fowler challenged his conviction under Rule 61, it was discovered that the recorded statements of four witnesses (*Jencks* statements) were never provided to the defense.[258] The *Jencks* statements called into question the eyewitness testimony that Fowler was the shooter for both

---

[252] *See State v. Fowler*, 2017 WL 4381384 (Del. Super. 2017)

[253] *See id.* at *4 ("*Jencks*, which has been codified as Superior Court Criminal Rule 26.2, requires the State, upon request, to produce statements of a witness to the defense prior to the cross-examination of that witness." (citing *Jencks v. United States*, 353 U.S. 657 (1957))).

[254] *Fowler v. State*, 194 A.3d 16, 27 (Del. 2018).

[255] *State v. Fowler*, 2017 WL 4381384, at *1 (Del. Super. 2017).

[256] *Fowler v. State*, 194 A.3d 16, 17 (Del. 2018).

[257] *Id.* at 17-18.

[258] *Fowler v. State*, 194 A.3d 16, 17 (Del. 2018). The *Jencks* statements that the State failed to timely produce included the following four witnesses: (1) Fowler's friend who was present at both shootings and accompanied Fowler on the drive to Florida (a drive made just hours after the second shooting); (2) Fowler's friend who was present at the second shooting and later joined Fowler in Florida; (3) a neighbor who witnessed the second shooting; and (4) Fowler's girlfriend who joined Fowler in Florida after the second shooting. *See id.* at 21.

shootings because the *Jencks* statements contained "information that contradict[ed], to various degrees, the trial testimony of [those] witnesses and bears on the motives certain witnesses had to claim that Fowler [and not another person present at the shooting] was the shooter."[259]  The Superior Court held that the *Jencks* violations were harmless error, citing "the fact that ballistic evidence linked the same weapon to both incidents makes the evidence of Fowler's guilt in each separate incident mutually reinforcing."[260]  While the Superior Court's ruling was on appeal, Rone was arrested.[261]  On appeal, the State argued that Rone's credibility issues were not important in view of the strong witness testimony.[262]  The Delaware Supreme Court found that the State's argument was circular because it was "trying to have each strand of arguably compromised evidence excuse the other."[263]  The Supreme Court held that "[w]hen the reliability of both strains of the key evidence the State used to prove Fowler was the shooter has been called into question, Rule 61 requires setting

---

[259] *Id.* at 21-22.
[260] *State v. Fowler*, 2017 WL 4381384, at *6 (Del. Super. 2017).
[261] *Fowler v. State*, 194 A.3d 16, 17 (Del. 2018).
[262] *Id.*
[263] *Id.* at 24.  The Supreme Court in *Fowler* described the State's "circular" argument as follows, in part:

> [The State] asked the Superior Court to excuse the *Jencks* violations as harmless because of the strength of its ballistic expert's testimony. And it now asks us to excuse the serious issues with that expert's credibility because of the compelling nature of the testimony by witnesses, several of whose *Jencks* statements were not timely disclosed.

*Id.* at 18.

aside the conviction."[264]

Romeo maintains his case is analogous to *Fowler* because: (1) "the out-of-court statements of the State's witnesses were never presented to the jury;" and (2) "Rone's testimony countering the ricochet theory was vital to the State's case."[265] Romeo's argument ignores the fact that *Fowler* involved the State's failure to timely produce the prior statements of four witnesses–a *Jencks* violation.[266] Unlike in *Fowler*, it is undisputed that Romeo's Trial Counsel had transcripts of the witnesses' statements to police, as well as transcripts of their testimony from the mistrial.[267] Here, the witnesses' out-of-court statements themselves "were never presented to the jury" because of Trial Counsel's previously discussed strategic decision to avoid having the damaging police interviews played for the jury.

Romeo has failed to articulate how the issue of Rone's credibility has created a significant change in the factual circumstances of his case. Romeo's argument overlooks the fact that Rone's testimony was not at all vital to Romeo's conviction. In *Fowler*, the Delaware Supreme Court found Rone's testimony was vital to both the State's theory and the opinion of the Superior Court because "if one accepted the expert's testimony, that the same weapon was present at each incident, it gave

---

[264] *Id.* at 18.
[265] Def.'s Suppl. Am. Mot. Reply 15.
[266] *Fowler v. State*, 194 A.3d 16, 23-24 (Del. 2018).
[267] *See supra* note 160.

the jury and the Superior Court a basis other than the eyewitness testimony to conclude that Fowler was the shooter."[268]  In sharp contrast, Romeo's conviction for First Degree Murder did <u>not</u> turn on Rone's testimony.  The shooting was witnessed by several people who provided statements to police and testified at trial. The jury was presented with eyewitness testimony from King, Sheila and Ray, all of whom testified that Romeo fired the first shot into the ground and subsequently fired two or three more shots.  Holden also told police during his interview that the first shot was towards the ground, which was presented to the jury through Det. Solge's testimony.[269]  Moreover, the State did not dispute that Romeo fired the first shot toward the ground and even conceded this fact in its closing argument.[270]  The jury found an intentional killing because the uncontroverted evidence showed that Romeo fired <u>multiple</u> shots at Antoine, and at least one was fired after Antoine was on the ground.[271]

The Court finds that the jury was presented with more than sufficient

---

[268] *Fowler v. State*, 194 A.3d 16, 22 (Del. 2018).

[269] *See* Tr. Holden Interview A359; *see also* 11/04/09 Trial Tr. 126.

[270] Trial Tr., D.I. 77, at 97-98, Nov. 9, 2009 ("[Ray, King, and Sheila] all stood before you in that chair, and what each and every one of them was able to articulate for you was the defendant's arm position during the first warning shot. It was down, whether they said it was a . . . 45 degree angle or whether they said what position on a clock it was . . . . They all told you his arm was pointing down.").

[271] *See* Tr. King Interview A401-02 (testifying that Romeo shot Antoine while he was on the ground and after the third shot Antoine "rolled on his back and blood is coming out of his mouth"); *see also* 11/04/09 Trial Tr. 189-94, 199-202 (Sheila testimony); 11/05/09 Trial Tr. at 95-99 (Ray testimony); Tr. Holden Interview A359-60; 11/04/09 Trial Tr. 115-20 (Holden testimony). The evidence also showed that four bullet cartridges were recovered from the scene.

evidence to find that Romeo intended to kill Antoine.[272]  For these reasons, the Court finds that Romeo has not demonstrated an important change in the factual circumstances sufficient to warrant relitigation of Ground Four.

### *Equitable Concern of Preventing Injustice*

Next, Romeo claims that the equitable concern of preventing injustice permits the Court to analyze the merits of his claims.  He contends that he would have been appointed counsel for his First Motion under the current version of Rule 61(e), which then would have provided him assistance throughout the postconviction process.[273]

When Romeo filed a Motion to Appoint Counsel to assist him in preparing the First Motion in November 2011, the version of Rule 61(e) in effect permitted the Court to appoint counsel for an indigent movant only in the exercise of discretion and for good cause shown.[274]  In denying the motion, the Court held that Romeo "has not articulated the claims he intends to pursue in his motion for postconviction relief" and thus "failed to establish good cause to justify the

---

[272] 11 *Del. C.* § 307 provides that the jury may infer the defendant's intention, recklessness, knowledge or belief at the time of the offense for which the defendant is charged.  In making this inference, § 307 permits the jury to "consider whether a reasonable person in the defendant's circumstances at the time of the offense would have had or lacked the requisite intention, recklessness, knowledge, or belief." 11 *Del. C.* § 307.  In view of all the eyewitness testimony, Rone's testimony was a non-factor.

[273] Def.'s Suppl. Am. Mot. Reply 5.

[274] Del. Super. Ct. Crim. R. 61(e) (2011).

appointment of counsel."[275] It appears Romeo believes that since this is his first motion for postconviction relief filed *with the benefit of counsel*, the Court should consider his Second Motion as his first attempt for postconviction relief. This argument implies that Romeo is entitled to start anew with his Rule 61 claims solely because the Court denied his request for appointment of counsel to represent him in the First Motion.

In amending Rule 61 to provide an indigent defendant the right to counsel in his or her first postconviction motion, the Superior Court clarified that the right was not retroactive.[276] The Court stated that the "amendment only applied to those defendants whose first postconviction motions were pending as of May 6, 2013, and to those who should file their first postconviction motion after May 6, 2013."[277] This amendment to Rule 61 as applied to Romeo's Second Motion does not create the "newly-recognized retroactive right" necessary to warrant reconsideration in the interest of justice under Rule 61(i)(4).

**Ground Five: Cross-Examination of Holden and Sheila**

Romeo argues that Trial Counsel's failure to use the out-of-court statements of Holden and Sheila to challenge the State's theory and undermine their credibility as witnesses was ineffective assistance. Romeo contends that "without cross

---

[275] *Romeo v. State*, Del. Super., D.I. 86 ¶¶ 5-6, Jurden, J. (Nov. 30, 2011) (ORDER).

[276] *See State v. Roten*, 2013 WL 4744681, at *2 (Del. Super. 2013), *aff'd*, 2013 WL 5808236 (Del. 2013).

[277] *See id.* (emphasis omitted).

examining the witnesses or playing their [out-of-court] statements, the jury was left solely with the narrative specifically crafted to support the State's theory – that Mr. Romeo started a fight and ended it with a gun."[278] Romeo further argues that since Trial Counsel did not challenge Det. Solge's improper testimony under Section 3507, evidence that directly contradicted witness testimony was never presented to the jury. Romeo argues that these failures by Trial Counsel resulted in prejudice, reasoning that "had trial counsel presented these inconsistencies to the jury, they would not have found Mr. Romeo guilty of Murder in the First Degree."[279]

As stated in Grounds Three and Four, Rule 61(i)(4) bars reconsideration of previously adjudicated claims. In Romeo's First Motion, he claimed ineffective assistance of counsel, alleging that Trial Counsel "failed to confront states [sic] witness's [sic] with their actual out of court statements for the purpose of impeachment and discrediting the state theory of intent."[280] In denying this claim, the Court held that Trial Counsel was effective and no prejudice to Romeo resulted from Trial Counsel's alleged ineffective actions.[281]

---

[278] Def.'s Suppl. Am. Mot. 9-14.
[279] Id. at 14.
[280] Def.'s First Mot.
[281] 2012 Order ¶ 27.

Accordingly, Ground Five is barred as previously adjudicated. Romeo has not demonstrated subsequent legal or factual developments that warrant reconsideration under the Rule 61(i)(4) exception.

**Ground Six:  Appellate Counsel**

Romeo argues that Appellate Counsel was ineffective for only raising on appeal the issue of Det. Solge's perjured testimony and failing to raise the issues as stated in Grounds One, Two, and Three of the instant motion.[282]

Romeo argued in his First Motion that Appellate Counsel was ineffective because he "failed to do any investigative work on appeal" and "only rais[ed] what he looked at as a sure win . . . overlooking everything else."[283]

In response to the allegations of ineffective assistance, Appellate Counsel provided a sworn Affidavit in which he averred: "as I explained to Mr. Romeo, I only found three possible grounds of error in the trial . . . (1) the lack of any plea offer, (2) the denial of an attorney of choice, and (3) the extraneous offense."[284] After learning that a plea was offered to, and refused by, Romeo, and that Romeo agreed with the Court's decision that it was too late for him to hire private counsel, Appellate Counsel declined to assert the first two grounds on appeal.[285]

---

[282] Def.'s Am. Mot. Reply 8.
[283] Def.'s First Mot. 3.
[284] Appellate Counsel's Aff., D.I. 92, May 31, 2012. The Court understands "the extraneous offense" as reference to the single issue actually raised on appeal - Det. Solge's alleged perjury.
[285] *Id.*

On October 19, 2012, the Court denied Romeo's claim of ineffective assistance of Appellate Counsel. The Court held:

> It is evident to the Court that Appellate Counsel attempted to provide Defendant with an appealable issue. It is evident that Defendant believes he had other issues to appeal. Defendant provided those issues in his present motion. Those issues have been fully reviewed by this Court and deemed without merit. Hence, Appellate Counsel cannot be ineffective for failing to raise them because there is no actual prejudice under *Strickland*.[286]

The Court finds that the same reasoning applies to Ground Six of this motion. It is apparent that Romeo believes the issues concerning Holden and Sheila's 3507 Statements and King's ineffective cross-examination were available to appeal. The Court has fully reviewed these claims and determined that they are without merit. As there is no actual prejudice under *Strickland*, Appellate Counsel cannot be ineffective for failing to raise them.

---

[286] 2012 Order ¶ 31.

## V. CONCLUSION

All of the claims raised in the present motion are either procedurally barred or otherwise do not warrant relief. The record shows that Romeo received effective assistance in both the trial and appellate phase of the proceedings and the Court is satisfied that no prejudice resulted from the alleged ineffective actions of Trial or Appellate Counsel.

For these reasons, Romeo's Motion for Postconviction Relief is **DENIED.**

**IT IS SO ORDERED.**

Jan R. Jurden, President Judge

Original to Prothonotary

Cc:   Martin B. O'Connor, Esquire
      Natalie S. Woloshin, Esquire

77